332 S.E.2d 141

**Charles W. NORTH**

v.

**WEST VIRGINIA BOARD OF REGENTS.**

**No. 16201.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 23, 1985.

Decided April 12, 1985.

Rehearing Denied June 11, 1985.

**181**

Edgar F. Heiskell, III, Heiskell & Cather, Morgantown, for appellant.

Richard E. Hardison, Sp. Asst. Atty. Gen., Beckley, for appellee.

NEELY, Chief Justice:

Today we revisit the case of Charles W. North, who was expelled from the West Virginia University School of Medicine because he falsified his original application for admission. We reversed and remanded this case on 29 March 1977, *North v. West Virginia Board of Regents*, 160 W.Va. 248, 233 S.E.2d 411 (1977), since we found that the procedure under which Mr. North was expelled was defective. After our original remand, the University conducted subsequent proceedings and the Committee on Student Discipline, by a split vote, recommended that Mr. North be expelled. The President of West Virginia University accepted that recommendation and Mr. North appealed to the West Virginia Board of Regents, which affirmed the decision of the

President. Mr. North then went to the Circuit Court of Kanawha County by *certiorari* where the judge, pending review of the proceedings, ordered that Mr. North be permitted to continue his medical training. Thus, in June 1981, Mr. North completed all of the requirements for a Doctor of Medicine degree. Nonetheless, on 24 June 1983 the Circuit Court affirmed the decision of the West Virginia Board of Regents. Mr. North now appeals.

In this appeal, Mr. North challenges the entire administrative process that ultimately led to his expulsion from the University Medical School. He does not, however, seriously challenge the underlying facts upon which that expulsion was based. We set the guidelines for the process that the university must follow in student disciplinary proceedings in Syllabus Point 3 of *North v. Board of Regents*, where we said:

Before a student can be permanently expelled from a State-supported university, he is entitled to the following due process rights: a formal written notice of charges; sufficient opportunity to prepare to rebut the charges; opportunity to have retained counsel at any hearings on the charges, to confront his accusers, and to present evidence on his own behalf; an unbiased hearing tribunal; and an adequate record of the proceedings.

Pursuant to our original ruling in *North*, on 15 June 1977, the University convened the Committee on Student Discipline comprised of three faculty members and two students. Mr. North had notice of the charges against him and was represented by competent retained counsel at the hearing. The Committee unanimously found that Mr. North had wilfully supplied the University with false material in his application for admission to the medical school concerning: (1) grade point average; (2) courses taken; (3) degrees; (4) birth date; and, (5) marital status. Although the Committee's final report, submitted 25 June 1977, was unanimous with regard to the findings of fact concerning the charges, the recommendation of expulsion was by a majority only. Indeed, Mr. North formally

denied any misconduct, but the record is abundant in its support of the Committee's conclusion that he fraudently procured his admission to the medical school. Consequently, other than his general denial, in the entire course of this litigation none of Mr. North's serious efforts was devoted to challenging the factual findings that formed the basis for his expulsion.

In the case before us now the petitioner does challenge the administrative process that ultimately led to his second expulsion. Before he was expelled, however, there was an extensive hearing before the Committee on Student Discipline, consideration by the President based upon the record made before the Committee, and consideration by the Board of Regents not only of the record made before the Committee, but also of transcripts of proceedings in a civil rights action filed by Mr. North against the President of the University in the United States District Court for the Northern District of West Virginia. An elaborate statement of the facts in that collateral federal action can be found in *North v. Budig*, 637 F.2d 246 (4th Cir.1981).

■ On this appeal, petitioner's assignments of error, taken collectively, amount only to a complaint that he did not receive the same "due process" during his disciplinary hearings that he would have received in a trial for treason in a United States District Court. That challenge, however, is adequately laid to rest by Syllabus Point 2 of *North v. West Virginia Board of Regents*, where we said:

Applicable standards for procedural due process, outside the criminal area, may depend upon the particular circumstances of a given case. However, there are certain fundamental principles in regard to procedural due process embodied in Article III, Section 10 of the West Virginia Constitution, which are: First, the more valuable the right sought to be deprived, the more safeguards will be interposed. Second, due process must generally be given before the deprivation occurs unless a compelling public policy dictates otherwise. Third, a temporary deprivation of rights may not require as

large a measure of procedural due process protection as a permanent deprivation.

To be more specific about the appellant's assignments of error, the appellant asserts five basic reasons for reversing the circuit court's affirmance of the Board: (1) there was no applicable rule or regulation prohibiting his misconduct; (2) the Committee on Student Discipline was improperly selected, and, as constituted, was not a fair and unbiased tribunal; (3) the circuit court erred in finding that appellant had waived any challenge to the composition of the Disciplinary Committee; (4) the University is estopped to sanction his misconduct because it failed to act in a timely manner; and (5) expulsion is an excessive and unjustified sanction.

I

■ Rule 4.02 of the "Policies, Rules and Regulations Regarding Students' Rights, Responsibilities and Conduct" was cited by the University in its notice of hearing as a part of the basis for its charge against the petitioner. Essentially, that rule prohibits disorderly conduct and in subsection (e): "The violation of any municipal, state or federal law or the rules and regulations of the Board of Regents or the institution." Also relied on by the University was a section contained in the *University Student Handbook* designated "Laws and University Regulations." An unnumbered paragraph under those laws and regulations states: "A student who violates any university rule or regulation is subject to disciplinary action which may result in probation, suspension or expulsion." A further unnumbered paragraph provides: "Falsification of records in any detail (academic records, health records, changed slips etc.) ... is prohibited." Essentially, Mr. North argues that the first rule prohibiting disorderly conduct has no application to this action. He then argues that the second rule, by being applicable specifically to a "student" cannot be deemed to bear on his conduct before he became a student at the University.

This crafty argument is ultimately unpersuasive; it employs legal reasoning akin to circus contortionism and ignores what is fundamental knowledge among all students of higher education, namely, that a person who cheats to get into school and gets caught will be expelled. In addition, a compelling argument can be made for the proposition that no rule or formalized written regulation is required to expel a student who gains admission to a college or university by lies and deceit. It is eminently doubtful that Mr. North was surprised at the suggestion that he might be subjected to expulsion because of his false credentials. Nonetheless, that proposition need not be explored here because there are independent grounds upon which the decision of the University can be sustained. Although Rule 4.02 clearly prohibits the violation of the rules of the University, there is specific reference to a bar against falsification of records. These two proscriptions, when read together, form a logical basis for the expulsion, unless these provisions have no applicability because North was not a student when he submitted the falsified documents to the University.

There is no doubt that the petitioner became a medical student because of his application, interview and supporting documents. His admission was assured only because he gave information that cast him in a more favorable light than the true facts would have allowed. From the date of his admission and his becoming a student, North enjoyed the fruits of his deliberate misrepresentations. Stated succinctly, North's very status as a student was dependent entirely upon his submission of falsified documentation in support of his application. In this light, the legal arguments advanced by the petitioner are not logic but sophistry.

■ Furthermore, independent of the University's rules and regulations, the actions of the hearing committee, the President, and the Board of Regents were justified on the basis that the petitioner committed fraud in obtaining his admission to the medical school. As argued by the respondent, it is settled doctrine that fraud in the procurement of an agreement or the obtaining of some benefit vitiates any right to receive the fruits of the contract or the benefits. *Jones v. Comer,* 123 W.Va. 129, 13 S.E.2d 578 (1941); *Engeman v. Taylor,* 46 W.Va. 669, 33 S.E. 922 (1899); *Dickinson v. Railroad Company,* 7 W.Va. 390 (1874). Syl. pt. 1 of *Engeman* says: "Fraud in the procurement of a deed or contract always renders it voidable." Consequently, it is obvious that the disciplinary action against the appellant should not have been dismissed for want of legal grounds for expelling him.

## II

■ In an omnibus challenge to the fairness of the hearing tribunal, the petitioner purports to describe a clandestine or surreptitious effort to undermine the impartiality of the hearing tribunal by various University officials. This challenge need not be given substantial attention for several reasons. First, notwithstanding the voluminous testimony offered in support of the petitioner's position, there was not shown, at any point in the record before the Committee on Student Discipline, or the transcript submitted to the Board of Regents, any bias in fact on the part of any of the members of the Committee on Student Discipline. Viewed in the light most favorable to the petitioner, there was a showing that University officials chose the hearing board and that the hearing board had some prior contacts with officials before the date of the hearing. No specific misconduct or attempts to prejudice the hearing body were shown. Although, if we were reviewing a treason conviction in the United States District Court we might, given the capital nature of the offense, be persuaded that there was sufficient *ex parte* contact to taint the prosecution, in the context of an administrative proceeding—particularly one in which the factual conclusions are not challenged—procedural rigidity such as that urged by the appellant is not required. *See* Syl. pt. 3, *North.*

■ Perhaps the most significant factor, however, in refusing relief to the petitioner

based upon his challenge to the hearing tribunal, is the fact that at the hearing, counsel for the petitioner conducted extensive *voir dire* of each of the committee members and concluded his inquiry by withdrawing any objection to those members hearing the evidence and making appropriate recommendations. In his finding that this constituted waiver of any objections to the composition of the Committee, the circuit court was entirely correct. The petitioner should not now be allowed to raise an objection previously clearly waived.

Finally, it is noteworthy that the Committee on Student Discipline was not empowered to decide the petitioner's fate. Instead, its charge under university regulations dealing with disciplinary action was to make recommendations to the President based upon its findings of fact. The President was the ultimate decision maker and, except for the obvious fact that he was also the ultimate University representative, he has not been charged with any bias or improper conduct or motives.

### III

 Mr. North asserts that the University sat on its knowledge that he had submitted false information supporting his application for admission and, therefore, concludes that the University is now estopped to pursue disciplinary remedies. Independent of the proscription against application of estoppel against the State or its agencies and subdivisions, there is simply no factual basis for this assertion. The record demonstrates unambiguously that appropriate authorities at the University acted expeditiously to bring the petitioner to a hearing immediately upon discovering that he had submitted false information in connection with his application for admission. Although the hearing and decision process initially began fitfully with some missteps, excluding time occupied by court hearings and appeals, the University resolved the matter before it with as much dispatch as is exhibited by many more experienced and sophisticated administrative agencies. Mr. North's allegation that the

University "should have known" of the fraud earlier implies that University personnel responsible for admissions should routinely devote sedulous efforts to uncover fraud in applications. We are, however, unwilling to acquiesce in this contention: in West Virginia, and particularly in our schools of law and medicine, we assume honesty and integrity on the part of those with whom we deal. There is no duty on the part of any officer at our colleges and universities to presume or even to suspect fraud.

### IV

Finally, Mr. North asserts that his expulsion is an excessive sanction for the transgression that he committed. Nonetheless, as we held in *North*, the courts of this state have traditionally given substantial deference to the discretion of officials of colleges and universities with respect to academic dismissal and such decisions "... are not ordinarily reviewable by the courts." *North*, at 160 W.Va. at 258, 233 S.E.2d 417–418. Indeed, there is a substantial justification for giving such discretion to school officials. Those officials are in the best position to understand and appreciate the implications of various disciplinary actions. Specifically, the President of West Virginia University and the Board of Regents have the best perspective to make disciplinary decisions based upon their impact on general admissions practices, the prospect of displacement of other students, the value of exemplary discipline, and the need to assure a high level of personal character in the graduates of professional schools.

 In recent years, many of the respected professions, including the professions of law and medicine, have come under unrelenting attack from the press because of the untoward conduct of a few of those professions' practitioners. The initial responsibility for determining the competence and suitability of persons to engage in professional careers lies with the professional schools themselves. As long as the conduct of educators is not high-handed, arbitrary or capricious, educators should be

left alone to do their job without interference from those of us in the judiciary who have neither the expertise nor the insight to evaluate their decisions.

Mr. North asserts that he has shown himself to be a competent student and a person who will be a competent practitioner of medicine. But he has also shown a substantial capacity for fraud and deceit by a carefully contrived plan to cheat his way into medical school in the first instance. The practice of medicine is not a simple matter of routine application of scientific principles relating to physiology, pharmacology, pathology or even surgery. Physicians must not only be technically competent, but they must also possess a surpassing degree of ethical commitment and a sense of human decency. On the record, any reasonable person would be justified in having reservations about whether Mr. North possesses sufficient character to allow him to practice medicine without subjecting the public to potential unethical conduct. *See W.Va.Code* 30-3-14(c) [1980] which provides that a medical license may be denied to any person who commits fraud in its procurement.

Although we have disparaged Mr. North's arguments, we have nothing but surpassing admiration for Mr. North's counsel, Mr. Edgar F. Heiskell, who has doggedly, diligently, and skillfully kept Mr. North's case alive since 1977. In fact, Mr. Heiskell, at points, almost accomplished a miracle. But finally, and given the amount of money the State of West Virginia has spent on Mr. North's education, reluctantly, we find we must affirm the circuit court, which did an equally thorough job in reviewing this case. In 1887, Judge Johnson, speaking for our Court in *Landeman v. Wilson & Beardsley et al.*, 29 W.Va. 702, at 720, observed that "[f]raud is an all-pervading vice, and whatever it touches it taints throughout. Part can not be bad and the rest good. It is all bad." That observation is as true today as it was nearly one hundred years ago; any action by the President of the University or the Board of Regents, short of expulsion, would necessarily have constituted some degree of reward for fraudulent misconduct on the part of the petitioner. It is, therefore, our conclusion that not only was the action complained of justified, it may well have been the only appropriate response available to the University.

Accordingly, for the reasons set forth above, the judgment of the Circuit Court of Kanawha County is affirmed.

Affirmed.