**LAKE ERIE INSTITUTE OF REHABILITATION, a DIVISION OF EXTENDED CARE CENTERS, INC., Plaintiff,**

v.

**MARION COUNTY, WEST VIRGINIA BOARD OF EDUCATION, Defendant,**

v.

**Eric EFAW, a minor, By and Through his father and natural guardian, Kenneth EFAW, Third Party Defendants.**

**Civ. A. No. 91–83 ERIE.**

United States District Court, W.D. Pennsylvania.

July 28, 1992.

Lawrence C. Bolla, Quinn Gent Buseck & Leemhuis, Erie, Pa., for plaintiff.

George R. Higinbotham, Jo Marie Pitrolo, Fairmont, W.Va., Gary Monaghan,

Davis & Davis, Uniontown, Pa., for defendant.

## MEMORANDUM OPINION

MENCER, District Judge.

Plaintiff Lake Erie Institute of Rehabilitation ("LEIR") brought this action seeking compensation for rehabilitative services rendered. Defendant Marion County, West Virginia Board of Education ("the Board") has filed a motion for summary judgment. LEIR's theory of recovery is based on contract and promissory estoppel; LEIR contends that the Board either entered into a contract or promised to pay for the rehabilitative services rendered to the Third Party Plaintiff, Eric Efaw, a student enrolled in the Marion County school system. The Board argues that under the applicable law, there is no issue of material fact remaining in the case and that the court should enter a favorable judgment as a matter of law.

This court has subject matter jurisdiction over the primary dispute under 28 U.S.C. § 1332, diversity of citizenship, and over the third party dispute under 28 U.S.C. § 1367, supplemental jurisdiction.

## I. FACTS

Sometime in late 1989 or early 1990, Kenneth Efaw, Eric's father, and Michael Bee, the Efaws' attorney, began negotiations with William Fox, an officer of LEIR, for the purpose of having Eric admitted to LEIR for rehabilitation. Although Mr. Efaw did not himself have sufficient cash assets to satisfy Mr. Fox that he would be able to pay for Eric's treatment, Mr. Bee was able to convince Mr. Fox that there were several possible sources of funding, including the Marion County Board of Education. Although at this point the Board had not played any role in having Eric admitted, the Board was charged by state and federal law to provide an education that addressed physical impairments such as Eric's. Although Mr. Fox did not feel fully assured that there would be funding for Eric's care, he permitted him to be admitted to the facility on a thirty day basis, which care would be terminated if it

became clear that no funding would be available. Eric was admitted on January 16, 1990.

In March 1990, representatives from the Board visited LEIR's facility located in Erie, Pennsylvania. Their purpose was to determine what services LEIR provided and how those services met Eric's educational needs. No specific agreement to provide funding for Eric's treatment arose out of that tour.

On or about May 19, 1990, Mr. Bee met with the Board's Placement Advisory Committee ("PAC") in Fairmont, West Virginia. The PAC is a committee formed of representatives of Marion County's special education program, as well as the parents of the child whose education is being planned. Under West Virginia Department of Education regulations, the PAC must develop an Individualized Education Program ("IEP") and make specific findings before a student will be placed in an out-of-state facility. The purpose of the meeting was to establish an educational program for Eric. Mr. Bee brought Eric's father Kenneth and Dr. Lantzy, a doctor from LEIR. During a recess of the meeting, Mr. Bee took the Superintendent of the Marion County schools, Mr. John Myers, aside. Mr. Bee then telephoned Mr. Fox in Pennsylvania and told him that he would like to mediate Eric's case.

The participants to this conversation do not agree on what was discussed. Mr. Fox understands that Mr. Myers agreed on behalf of the Board to fund Eric's care up to $70,200.00. Mr. Myers believes that all that was concluded was that the Board would pay no more than $70,200.00, should the Board decide to fund the care at all. That such a misunderstanding should occur becomes understandable once it is learned that Mr. Myers and Mr. Fox never spoke directly or heard each other speak, and that Mr. Bee served as the intermediary of the conversation. Nevertheless, it is LEIR's position that Mr. Myers promised to fund Eric's care.

On June 12, 1990, Mr. Bee sent a letter that purported to summarize the agree-

ments of the parties, in which the Board was to fund Eric's care for $70,200.00. In addition, the contract contained a provision that if any third parties, such as a health insurer, should agree to pay for Eric's care, then that money was to be used first for attorney's fees and costs, and if any funds remain, to pay any outstanding bills to LEIR. The parties agree that the letter is not completely accurate regarding what agreements had been reached in previous conversations, but LEIR contends that the letter is accurate inasmuch as it places responsibility for payment of $70,200.00 on the Board.

## II. ANALYSIS

The Board contends that it is entitled to a summary judgment because it is undisputed that no written contract was ever executed and that the full Board never acted to approve the financing of rehabilitative care for Eric. Either of these acts are sufficient to render the payment of state funds *ultra vires,* and the state, through its organ, the Board of Education, is not bound contractually or quasi-contractually by *ultra vires* actions under West Virginia law. LEIR's position is that this dispute is governed by the law of Pennsylvania, not West Virginia, and that Pennsylvania law does not in every situation permit state agencies to abrogate *ultra vires* actions.

Thus, the court is presented with two questions: one, whether Pennsylvania or West Virginia law governs this dispute; and two, whether, construing the facts in the manner most favorable to the nonmovant, the applicable law would permit the Board to invalidate any obligations to LEIR that it may have incurred.

### A. *Choice of Law Analysis*

■ In diversity cases such as the instant dispute, a federal court must apply the choice of law principles of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Melville v. American Home Assurance Co.,* 584 F.2d 1306, 1308 (3d Cir.1978). Therefore, Pennsylvania

choice of law principles must be consulted to determine which law applies.

■ Pennsylvania was among the first jurisdictions to abandon the common law doctrines of *lex loci delicti* and *lex loci contractus.* In *Griffith v. United Airlines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964), the Pennsylvania Supreme Court announced the adoption of a "flexible rule" that "permits analysis of the policies and interests underlying the particular issue before the court." 203 A.2d at 805. Many federal courts in Pennsylvania have held that *Griffith* essentially adopts the approach outlined in the *Restatement (Second) of Conflicts of Law. See Compagnie des Bauxites v. Argonaut–Midwest Ins. Co.,* 880 F.2d 685, 688 (3d Cir.1989); *Melville v. American Home Assurance Co.,* 584 F.2d 1306, 1308–09 (3d Cir.1978); *American Int'l Underwriters Corp. v. Zurn Indus., Inc.,* 771 F.Supp. 690, 694–95 (W.D.Pa.1991). However, these courts have also employed interest analysis as a supplement to the Restatement test, because the *Griffith* opinion indicates that its rule requires "analysis of the policies and interests underlying the particular issue before the court." *Griffith,* 203 A.2d at 805–06.

The Second Restatement approach is to identify important contacts between the dispute and the jurisdiction. The Restatement identifies the following factors as the most important in contract cases in which there has been no effective choice of law by the parties to the contract:

[T]he contacts to be taken into account ... to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

*Restatement (Second) of Conflict of Laws,* § 188(2).

Three of these contacts have little relevance to this case. Comment e to section 188 identifies the place of negotiation as ordinarily a "significant contact," but states that "this contact is of less importance when there is no one single place of negotiation and agreement, as, for example, when the parties do not meet but rather conduct their negotiations from separate states by mail or telephone." The evidence presented indicates that the alleged oral contract was formed on the telephone, with each party remaining in its respective state. Similarly, the place of contracting has low relevance. Comment e indicates that the place of contracting should be considered as a supplemental reason for finding that the place of negotiations and/or the place of domicil of the parties is the controlling jurisdiction. It is not to be considered an important factor if the place of contracting is "purely fortuitous," as in this case, in which the place of contracting depends on which party accepted the offer of the other, thus completing the element of the contract. Even if a contract was formed, although this has not been established, the record does not indicate which party offered and which party accepted.[1]

Comment e also makes clear that the situs of the subject matter of the contract is relevant primarily when the contract deals with a specific physical thing, or in the case of insurance contracts, when there is a localized risk which the contract insures. It has little relevance in cases in which the contract is for services, such as this case.

The germane contacts in this case are the place of performance and the parties' place of business. Place of performance has obvious significance because this case involves an alleged contract for services of physical rehabilitation. These services were to be performed at LEIR's facilities in Erie, Pennsylvania. Furthermore, the Board's duty of performance, namely payment for the services, was to be effected in

Pennsylvania: the Board would have been required to deliver a check to LEIR's facility in Pennsylvania.

The place of business of the parties is a particularly significant consideration. The domicil or place of business is important for two reasons: first, in cases involving a defense of incapacity to contract, section 198 indicates that the state of domicil of the party asserting incapacity assumes a greater significance; and second, one of the parties, the Board, is an entity created by and maintained through support of tax dollars of one of the states. Both of these reasons support giving greater weight to the place where the Board is located, West Virginia.

Thus, Pennsylvania was to be the place of performance and West Virginia was and continues to be the location of the Board of Education. A simple tally of the contacts would not provide an answer to the central question of which state has a greater claim to exercising jurisdiction over the suit. However, the Restatement indicates that a court should, in addition to examining the contacts outlined in section 188, also consider the extent to which the policies and interests of the competing jurisdictions are implicated in the dispute. "In general, it is fitting that the state whose interests are most deeply affected should have its local law applied." *Restatement (Second) of Conflict of Laws*, § 6, comment f. In this sense, the Restatement echoes the *Griffith* court's directive that a court should perform some interest analysis before settling a choice of law question.

A comparison of the two states' interests in this dispute leads the court to the conclusion that West Virginia is the more interested jurisdiction. The Marion County Board of Education is a subdivision of the State of West Virginia, and is charged to carry out all activities relating to public education within Marion County. W.Va. Code § 18–5–13 (1966). Pennsylvania courts have recognized that when another

---

1. Although section 188 deals with contract cases, the court deems its provisions broadly applicable to cases involving theories of promissory estoppel as well. Clearly, a Restatement approach would consider the place where the

promise was made to be an important contact with the jurisdiction. In this case, any promise would have been made in West Virginia, where Superintendent Myers was located during the telephone conversation.

state's agency or subdivision is a party to a lawsuit, that state has a heightened interest in the proceedings. *See Flamer v. New Jersey Transit Bus Operations,* 414 Pa.Super. 350, 607 A.2d 260, 264 (1992) (citing, *inter alia,* the fact that state-operated bus system received a significant portion of its operating funds from New Jersey tax dollars as a basis for its decision that New Jersey, not Pennsylvania, had the more significant relationship to the dispute).[2]

In contrast, Pennsylvania's interests in this dispute are more modest. Pennsylvania unquestionably has an interest in ensuring the sanctity of contracts entered into by its citizens and businesses with out-of-state parties. However, Pennsylvania law itself provides that under certain circumstances *ultra vires* contracts or promises made by its own state agencies may be abrogated. *See Wilson v. Southeastern Pa. Transp. Auth.,* 709 F.Supp. 623, 626–27 (E.D.Pa.1989). Although West Virginia law apparently permits state agencies to cancel *ultra vires* obligations in more instances than does Pennsylvania, *see e.g., Freeman v. Poling,* 175 W.Va. 814, 338 S.E.2d 415, 420–21 (1985), Pennsylvania law plainly recognizes the principle that a state has the authority to control its agencies' contracting power through the application of state law. The application of West Virginia law would not violate Pennsylvania's public policy. Accordingly, the court deems West Virginia law to control the question of whether a valid contract or promissory estoppel claim exists.

### B. *Contractual or Quasi–Contractual Liability of the Board*

■ The Board sets forth several arguments why any commitment to pay for Eric's rehabilitative care made by Superintendent Myers would be insufficient to have binding legal effect on the Board. In the court's opinion, the most powerful argument advanced is that, even assuming a commitment to pay was made, the procedures requisite to using state funds to pay for Eric's rehabilitation mandated by state law and regulations were not followed.

In West Virginia, the county boards of education are charged by statute to establish and maintain special educational programs for exceptional children. W.Va. Code § 18–20–1 (1966). In order to aid the several county boards of education in this mission, the West Virginia legislature placed responsibility on the State Superintendent of Education to prepare:

> the necessary rules, regulations, formula for distribution of available appropriated funds, reporting forms and procedures necessary to define minimum standards in providing suitable facilities for education of exceptional children and ensuring the employment, certification and approval of qualified teachers and therapists subject to approval by the state board of education.

W.Va.Code § 18–20–5 (1966). Pursuant to this statute, the West Virginia Department of Education, Office of Special Education issued Policy 2419, "Regulations for the Education of Exceptional Students," effective September 5, 1989. Under section 1.3 of Policy 2419, the county boards are directed to establish policies and implement written procedures for conducting a PAC meeting whose purpose is to establish an "individual education placement" (IEP) for each exceptional student. The PAC is required to determine the student's eligibility for special educational services, and, if the student is determined to be eligible, the PAC is then directed to formulate a "placement" into an educational program that meets the student's particular educational requirements. The PAC is required to consider first whether a local program can meet the student's needs. Only after it is decided by the PAC that no local program will meet the student's needs is the PAC permitted to consider other options, such as

---

2. *Laconis v. Burlington Co. Bridge Comm'n,* 400 Pa.Super. 483, 583 A.2d 1218 (1990) is not inconsistent. In that case, the court applied Pennsylvania law to find that the bridge commission was negligent in spite of the Bridge Commission's objections that it was a division of the State of New Jersey and that under New Jersey law, it was immune from suit. In choosing to apply Pennsylvania law, the court recognized that the Bridge Commission was a creature of New Jersey law, but noted that the Bridge Commission was not supported by state tax dollars and that the accident occurred on land that, although owned by the Bridge Commission, was located in Pennsylvania. 583 A.2d at 1222–23.

placement in an out-of-state program. W.Va.Dept. of Education Policy 2419 § 1.3(D)(6)(a). In addition, the Board submits that there is an implicit requirement that the PAC determine that the out-of-state facility serves the educational, not medical, needs of the student.[3]

Furthermore, the Board contends that a unilateral action by one member of the Board, such as the alleged promise made by Superintendent Myers, is *ultra vires.* The court is satisfied that this is a valid proposition. *See Parker v. Summers Co. Bd. of Education,* 185 W.Va. 313, 406 S.E.2d 744, 748 & n. 8 (1991); *Daugherty v. Board of Education of Philippi Dist.,* 86 W.Va. 522, 103 S.E. 406, 407 (1920).

There is no evidence that the regulations regarding the preparation of an IEP were followed by the Board. In addition, there is no evidence that the Board ever ratified the alleged promise made by Superintend-

ent Myers. As such, this action is *ultra vires,* or beyond the authority of the Board. *See Parker, supra.*

■ In West Virginia, public bodies cannot be contractually or quasi-contractually bound by the *ultra vires* actions of their officers or employees.[4] *E.g., Freeman v. Poling, supra; Martin v. Pugh,* 175 W.Va. 495, 334 S.E.2d 633, 641 (1985); *North v. West Virginia Bd. of Regents,* 175 W.Va. 179, 332 S.E.2d 141, 146 (1985); *Samsell v. State Line Development Co.,* 154 W.Va. 48, 174 S.E.2d 318, 325 (1970).[5] Accordingly, the court finds that the Board of Education is entitled to a summary judgment in its favor.[6]

### C. Discretionary Dismissal of Third Party Actions under 28 U.S.C. § 1367(c)(3)

The effect of granting summary judgment in favor of the Board is to eliminate

---

**3.** There seems little doubt that these regulations are binding on the county boards of education. West Virginia's highest court, the Supreme Court of Appeals, has on several occasions ruled that regulations promulgated by the State Board of Education can have binding force on county boards of education, even if those regulations conflict directly with a statute that places authority over a certain area in the county boards of education. In *Bailey v. Truby,* 174 W.Va. 8, 321 S.E.2d 302 (1984), the court held that a State Board of Education regulation that provided that students must attain a minimum academic performance before they could engage in extracurricular activities was binding on a county board of education that had voted unanimously to refuse to implement the regulation. The county board argued that a statute had provided that the county boards of education were "granted and shall exercise the control, supervision and regulation of all ... extracurricular activities of the students ..." W.Va. Code § 18–2–25 (1984). Despite this express grant of power to the county boards, the court ruled that the West Virginia Constitution placed authority for the "general supervision of the free schools" in the State Board of Education and upheld the authority of the State Board's regulations over the county board's actions. *Id.* at 312–13, 321 S.E.2d 302.

**4.** The Board also claims that "... if the state's procedures, such as Policy 2419, are not strictly adhered to, and the student is unilaterally placed by the parents in a nonapproved facility, then the local school board cannot be held to be financially responsible, according to federal law." Memorandum in Support of Defendant's

Motion for Summary Judgment, at 12. However, the court does not accept that the case cited, *School Comm'n of Burlington, Mass. v. Massachusetts Bd. of Education,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), stands for this proposition. The Education of the Handicapped Act, 20 U.S.C. § 1401 *et seq.,* does not proscribe the possibility that a local school board can be liable in such a circumstance if the local state law mandates that it be liable; rather, the Act permits, but does not require, the states who receive federal monies to refuse to pay for education services when the state's procedures for placement have not been followed.

**5.** Parenthetically, it is possible that Pennsylvania law would mandate the same outcome. *Wilson v. Southeastern Pa. Transp. Auth.,* 709 F.Supp. 623 (E.D.Pa.1989), cited previously, contains a discussion of the power of state officers in Pennsylvania to bind their agencies through *ultra vires* acts. One side to the controversy believes that an *ultra vires* act may never bind a state agency; the other side considers that state officers may bind the agency if the contested action was within the power of the agency to authorize. *Id.* at 626–27. This court need not reach the question of what the law of Pennsylvania is since it has already held that the law of West Virginia is controlling.

**6.** Having found that the Board is correct that any promise or contract entered into by the Superintendent would have been *ultra vires,* the court does not pass on the other theories advanced by the Board regarding why it is entitled to a summary judgment.

the plaintiff and the defendant from this lawsuit. The plaintiff LEIR is entirely eliminated as a party because its only capacity in the suit was as plaintiff. The Board, on the other hand, is both a defendant to the main action and a third-party plaintiff. The grant of summary judgment does not affect the third party suit in any substantive manner.

Nevertheless, once the main action is dismissed in this case, there is no further basis for ancillary, or supplemental, jurisdiction. Both of the third parties are citizens of the same state, West Virginia. Under 28 U.S.C. § 1367(c)(3), it is within the discretion of the district court to decline to exercise supplemental jurisdiction once all claims over which it has original jurisdiction have been dismissed. The court now exercises that discretion, and dismisses the third party action.

### ORDER

AND NOW, this 28th day of July, 1992,

IT IS HEREBY ORDERED that the Motion for Summary Judgment filed by the Defendant, Marion County, West Virginia Board of Education, is GRANTED.

IT IS FURTHER ORDERED that the Third Party suit, filed by the Third Party Plaintiff, Marion County, West Virginia Board of Education, against the Third Party Defendant, Eric Efaw, by and through Kenneth Efaw, is DISMISSED without prejudice.

Judgment is entered in favor of the Defendant, Marion County, West Virginia Board of Education, and against the Plaintiff, Lake Erie Institute of Rehabilitation.