575 S.E.2d 112

**Betty BENDER, Plaintiff Below, Appellant**

v.

**ALDERSON–BROADDUS COLLEGE, Defendant Below, Appellee.**

No. 30458.

Supreme Court of Appeals of West Virginia.

Submitted: Sept. 18, 2002.

Decided Oct. 31, 2002.

Dissenting Opinion of Justice McGraw Dec. 11, 2002.

---

Basil R. Legg, Jr., Clarksburg, for the Appellant.

Amy M. Smith, Nancy W. Brown, Steptoe & Johnson, Clarksburg, for the Appellee.

Michael John Aloi, Manchin & Aloi, P.L.L.C., Fairmont, for Amicus Curiae, West Virginia Independent Colleges & Universities, Inc.

ALBRIGHT, Justice:

Betty Bender (hereinafter "Appellant") appeals from the June 19, 2001, order of the Circuit Court of Barbour County by which the lower court granted summary judgment in favor of Alderson–Broaddus College (hereinafter "Appellee" or "Appellee College") on the ground that a private college may increase the academic requirements for completion of a sequential multi-year degree program after a student has enrolled and completed a portion of the program as long as the change is not arbitrary and capricious. Upon due consideration of the petition, briefs, record and arguments, we affirm the decision of the circuit court for the reasons set forth below.

## I. Factual and Procedural Background

Appellant became a student at Appellee College in the fall of 1996 and was accepted into Appellee's nursing program at the beginning of her sophomore year.[1] According to Appellant, before she enrolled at the school, she and her husband met with the chair of Appellee's nursing department, Dr. Sharon Boni, to discuss the academic standards of the nursing program. Appellant asserts that Dr. Boni explained that students were required to complete the nursing program within five years[2] of being admitted to the Appellee College and that the minimum qualifications for graduation from the nursing program were a grade of "C" (defined also as a grade of at least seventy percent) in all required nursing courses and a cumulative grade point average (hereinafter "G.P.A.") of 2.0 on a scale of 4.0 in all course work. Appellant further maintains that she and her husband pointedly asked Dr. Boni during this meeting whether the Appellee College could increase these minimum academic requirements after Appellant was admitted into the nursing program. Appellant contends that

Dr. Boni assured her that these academic requirements could not, by law, be changed so as to affect students already accepted into the multi-year nursing program.[3]

Statements regarding amendment of any college policies were included in various college publications available to students during the time Appellant was deciding which school to attend as well as during her term of attendance at Appellee college. The inside covers of Appellee College's 1995–1997 Catalog and 1999–2001 Catalog stated:

> The provisions of this bulletin are not to be regarded as an irrevocable contract between the student and the College. The College reserves the right to make and designate the effective date of changes in curricula, course offerings, fees, requirements for graduation, and other regulations at any time such changes are considered to be desirable or necessary.

The catalogs also contained information regarding grade point averages, but there was no reference to the grading scale. The Policy and Procedure Manual of the Department of Nursing at Appellee College, which all nursing students were required to purchase and maintain, contained the following provision regarding amendment to nursing program policies:

> Policies affecting nursing students and/or nursing faculty are developed and/or revised through the action of various nursing department committees and finalized by the Nursing Faculty Organization. Copies of revised policies will be distributed to students and faculty with discussions as appropriate.

The Policy and Procedure Manual contained information regarding G.P.A. requirements and the current grading scale.[4] Additionally, the Student Handbook for the school years

1. Candidates for a bachelor of science degree in nursing at Appellee College are considered pre-nursing students; acceptance into the nursing program does not occur until after a pre-nursing student has successfully completed the first year of general studies.

2. The school requires that the three-year nursing program be completed by a student within four years after being admitted into the program, or a total of five years from admission into the school.

3. Dr. Boni testified that she did not remember making such statements to Appellant and her husband.

4. The nursing department's policy and procedure manual was a looseleaf document which students updated when the faculty supplied them with revisions.

1995–1997, 1998–2000, 1999–2001 contained the following reservation regarding college policies:

> The provisions of this handbook are not to be regarded as an irrevocable contract between the student and the College. The College reserves the right to make and designate the effective date of changes in college policies and other regulations at any time such changes are considered to be desirable or necessary.

After deciding to attend Appellee College, Appellant completed her first year (1996–97) of general studies and her first year in the nursing program (1997–98) without apparent difficulty. However, in the fall of 1998, Appellant received a final grade of "D" in two nursing courses. As a result, Appellant could not take nursing courses in the 1999 spring semester because the classes she needed to repeat due to her unsatisfactory performance were only offered during the fall semester and were prerequisites to the nursing courses offered during the spring term. Consequently, Appellant enrolled in general studies classes in the spring of 1999 and then registered in the fall of 1999 to repeat the nursing classes in which she received "D" grades.

During the fall 1998 semester, Appellee's Nursing Department Curriculum Committee embarked upon a study of the grading scale policy. According to the minutes of its September 9, 1998, meeting, this committee decided to examine data from previous years to determine if students receiving the grade of "C" with scores in the low seventy percent range were more likely to fail the National Council Licensure Examination. After reviewing all of the compiled data, the Curriculum Committee voted in October 1998 to recommend a new grading scale whereby a minimum score of seventy-five percent would be required in order to earn a "C" grade. The new grading scale was ultimately approved in December 1998, with its implementation delayed until the fall 1999 semester so the nursing students would receive advance notice of the change.[5] The revised grade scale was applied to all nursing students, including those students who had enrolled under the more lenient seventy percent standard.[6]

Appellant was able to meet the new grading standard in her classes during the fall 1999 semester. However, in the spring 2000 semester she failed to achieve the minimum score of seventy-five percent in one nursing class and received a grade of "D"; the score she attained in that class was above seventy percent, for which she would have received a grade of "C" under the policy in effect at the time of her admission to the nursing program. Because Appellant could not repeat this required class until the following spring semester, it became impossible for her to complete the nursing program within five years from her admission to the school. Therefore, Appellee academically expelled Appellant from the nursing program in May 2000.

On August 10, 2000, Appellant filed a civil action against Appellee seeking injunctive relief as well as damages. After conducting an evidentiary hearing, the lower court issued an order on October 15, 2000, by which it denied the requested injunction but allowed the action to proceed upon the issue of damages. According to the October 15 order, the two theories on which Appellant would proceed with regard to damages were breach of contract and promissory estoppel.[7]

The sum of Appellant's argument to the lower court was that she and the college had a contractual relationship based on the representations made in or reasonably inferred from the publications of Appellee College as well as the verbal assurances made by Dr. Boni. Appellant maintained that by the terms

---

**5.** Appellant testified that she received multiple advance notices of the grading change and did not question whether the change would be applied to her.

**6.** The minimum cumulative G.P.A. required of nursing students was also increased at this time. Although the same implementation date was established for the revised G.P.A., it was applied only to incoming freshmen.

**7.** Additional bases for award of damages were enumerated in Appellant's complaint; for reasons not entirely clear from the record, only the breach of contract and promissory estoppel theories were developed.

of her contract with Appellee the nursing program grading requirements would not change during the course of her enrollment. Therefore, when Appellee began judging Appellant's course work against a different grading standard than that in effect at the time she enrolled, Appellee breached its contract with her. Appellant alternatively argued that the facts supported an award of damages against the college under the doctrine of promissory estoppel.

Following discovery, the parties filed cross-motions for summary judgment which were the subject of a hearing on June 8, 2000. Subsequently, the circuit court granted summary judgment in Appellee's favor on June 19, 2001. The summary judgment order contained the following rulings by the lower court:

> 11. The nature of the relationship between the Plaintiff and A–B College is clearly contractual in nature; however, implicit in that contract is a right to change the college's academic degree requirements if such changes are not arbitrary and capricious.
>
> 12. In regard to the Plaintiff's claim that Dr. Boni's oral statements are binding on the college, the Court finds that whether or not Dr. Boni made the statements attributed to her by the Plaintiff is immaterial.... A–B College clearly had the right to unilaterally change the grading scale of the nursing program as long as such change was not arbitrary and capricious.
>
> 13. The record is devoid of any facts to establish the action of A–B College in modifying its grading scale as arbitrary and capricious....

It is from the June 19, 2001, order that Appellant filed the instant appeal.

## II. Standard of Review

■■■ As we held in syllabus point one of *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994), "[a] circuit court's entry of summary judgment is reviewed *de novo.*" We have also recognized that: "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. Pt. 3, *Aetna Casualty & Surety Co. v. Federal Ins. Co. of N.Y.,* 148 W.Va. 160, 133 S.E.2d 770 (1963).

## III. Discussion

At issue in this case is not whether a contract existed between the parties. Rather, Appellant assigns error to the lower court's finding that the actions of Appellee were not arbitrary and capricious under the terms of the contract. More specifically, Appellant argues that Appellee College acted arbitrarily and capriciously when it changed and applied a different grading scale to her work than that which was in place when she enrolled in the nursing program and such behavior amounted to a breach of contract or, in the alternative, the basis for a successful promissory estoppel claim.

Initially we note that this Court previously has adopted the mainstream position that judicial review of purely academic decisions of a post-secondary school is decidedly limited. *North v. W.Va. Bd. of Regents,* 175 W.Va. 179, 184–85, 332 S.E.2d 141, 146–47 (1985). The New York Court of Appeals aptly summarized the public policy basis for showing judicial deference in this regard by saying:

> When an educational institution issues a diploma to one of its students, it is, in effect, certifying to society that the student possesses all of the knowledge and skills that are required by his chosen discipline. In order for society to be able to have complete confidence in the credentials dispensed by academic institutions, however, it is essential that the decisions surrounding the issuance of these credentials be left to the sound judgment of the professional educators who monitor the progress of their students on a regular basis.

*Olsson v. Board of Higher Ed.,* 49 N.Y.2d 408, 426 N.Y.S.2d 248, 402 N.E.2d 1150, 1153 (1980). Some federal courts have observed that the judiciary is particularly ill-equipped to evaluate a school's academic decisions with respect to the health care field. *See, e.g., Doherty v. Southern Coll. of Optometry,* 862 F.2d 570 (6th Cir.1988); *Jansen v. Emory Univ.,* 440 F.Supp. 1060 (N.D.Ga.1977), *aff'd,*

579 F.2d 45 (5th Cir.1978); *Connelly v. Univ. of Vermont and State Agric. Coll.,* 244 F.Supp. 156 (D.Vt.1965).

The foregoing notwithstanding, this Court has not condoned absolute judicial deference with regard to academic decisions made by institutions of higher education. We announced in *North v. West Virginia Board of Regents,* 175 W.Va. 179, 332 S.E.2d 141 (1985), when judicial review of such decisions is appropriate by saying in syllabus point three that:

> [t]he initial responsibility for determining the competence and suitability of persons to engage in professional careers lies with the professional schools themselves and if the conduct of educators is not high-handed, arbitrary or capricious, the courts of this state should give substantial deference to the discretion of officials of colleges and universities with respect to academic dismissals and such decisions are not ordinarily reviewable by the courts.

*Id.* at 181, 332 S.E.2d at 143. In other words, when faced with a claim that the actions of a university or college with regard to academic decisions are arbitrary and capricious, then the historical deference granted by courts to the judgment of higher education institutions is set aside.[8] Although the controversy in *North* concerned the dismissal of a medical student from a public institution, we see no reason why the same arbitrary and capricious standard should not apply to the comparable decisions of a private institution. A number of jurisdictions have adopted this position. *See, e.g., Ishibashi v. Gonzaga Univ.,* 101 Wash.App. 1078, 2000 WL 1156899 (Aug. 11, 2000); *Goodwin v. Keuka Coll.,* 929 F.Supp. 90, (W.D.N.Y.1995); *Frederick v. Northwestern Univ. Dental School,* 247 Ill.App.3d 464, 187 Ill.Dec. 174, 617 N.E.2d 382 (1993); *Love v. Duke Univ.,* 776 F.Supp. 1070 (M.D.N.C.1991); *Babcock v. New Orleans Baptist Theological Seminary,* 554 So.2d 90 (La.Ct.App.1989); *Abbariao v. Hamline Univ. School of Law,* 258 N.W.2d 108 (Minn.1977); *DeMarco v. Univ. of Health Sciences/Chicago Medical School,* 40

Ill.App.3d 474, 352 N.E.2d 356 (1976); *Frank v. Marquette Univ.,* 209 Wis. 372, 245 N.W. 125 (1932). Consequently we hold that legal challenges to academic decisions of private institutions of higher education are subject to judicial review under an arbitrary and capricious standard. Therefore, we find as a matter of law that the lower court in the instant case applied the correct standard of review.

We now turn to an examination of whether the actions of the Appellee College in the case before us were arbitrary and capricious. In applying this standard we are guided by this Court's holding in syllabus point three of *In re Queen,* 196 W.Va. 442, 473 S.E.2d 483 (1996), wherein we said that the arbitrary and capricious standard of review presumes the actions taken "are valid as long as the decision is supported by substantial evidence or by a rational basis." *Id.* at 444, 473 S.E.2d at 485. We are also mindful that we have previously recognized that an "action is arbitrary and capricious when it is unreasonable, without consideration, and in disregard of facts and circumstances of the case." *State ex rel. Eads v. Duncil,* 196 W.Va. 604, 614, 474 S.E.2d 534, 544 (1996) (citation omitted).

Based upon our review of the record as explained below, we do not believe Appellee College acted arbitrarily or capriciously in instituting its modified grade scale. Given Appellee's clear and express reservation for making policy changes, as stated in the college's catalogs, handbooks and procedure manuals during the relevant period, it was reasonable for Appellee to expect students to anticipate and comply with changes made to its grading scale. An update of degree requirements is often necessary in a profession such as nursing and, as disclosed in the record, the college undertook the study of the grading scale out of concern with the performance of its graduates on the nursing board examination. A letter in the record from the Board of Examiners for Registered Professional Nurses to Appellee's nursing department supports this concern since it related that the pass rate on the nursing board

8. We recognize that courts have adopted different standards of review when educators' decisions are based upon disciplinary rather than academic matters. Only the latter arises in the case before us.

examination by the school's graduates was below the established standard. Likewise, the manner in which the modification was studied, adopted and implemented by the school reflects a balance of concern for the welfare not only of the institution but also the student population. The record shows that a variety of data was examined and an extensive review process was conducted by the school before the modification to the grade scale was made. We note further that although the grade modification was approved in December 1998, the change was not implemented until the fall 1999 semester, which the record reflects was done in order to enable the Department of Nursing to provide ample advance notification to its students. The school's concern with adequate advance notice of the change is borne out through Appellant's testimony, which revealed that she received information regarding the implementation of a grade scale modification in the following ways: memorandum from Dr. Boni, dated July 23, 1999; verbal instruction during the mandatory health sciences orientation on August 24, 1999; and verbal explanation by all of her nursing instructors as well as through written materials the instructors distributed to their classes. Furthermore, and perhaps most important, the record shows that the college made bona fide efforts to assist the students in meeting the revised grading standard. There is documentation in the record of Appellant being routinely apprised by her instructors regarding her academic progress in a class and that the instructors extended offers of various types of assistance with studying when Appellant began experiencing difficulty in her class performance. Even after Appellant was dismissed from the nursing program, Appellee encouraged Appellant to complete her degree at the college in a field of study more suited to her abilities. Based upon this and other undisputed and substantial evidence in the record, the actions of the college in modifying and implementing the modification of its grade scale were not unreasonable, arbitrary or capri-

cious. Consequently, we affirm the decision of the circuit court.[9]

To be clear, our decision today does not constitute the wholesale approval of grading scale modifications by institutions of higher education. Certainly, we may have reached a different conclusion had the evidence not shown that the grading scale change undertaken by the college reflected a measure of concern for the enhancement of the student's educational experience as well as advancement of the institution's reputation and goals.

Accordingly, we affirm the June 19, 2001, order of the Circuit Court of Barbour County granting summary judgment in favor of Appellee College.

Affirmed.

Justice McGRAW dissents and files a dissenting opinion.

McGRAW, Justice, dissenting:

Ms. Bender started a challenging nursing program under certain conditions, and I believe she should have been able to complete the program under the same conditions that applied when she started. Ms. Bender signed up, if you will, for a ten mile race, but during the running of it, the school decided to add an extra mile. While a Marine Corps drill instructor might make such a change for psychological reasons, I don't think the school should have been able to do that to Ms. Bender.

Several details of the program suggest that the school's choice of scheduling classes make it difficult to complete, even under the best of circumstances. One must finish in five years, but many required courses are only offered once a year. As the majority points out, Ms. Bender lost a semester when poor grades required her to repeat a class. We do not know why it is Ms. Bender performed poorly that semester, but certainly she is not the first student to do so. A student might face the birth of a child, the death of a parent, or a serious illness during his or her course of study, any of which might result in a poor outcome for grades. But under the program as described, that

9. Our affirmance of the lower court's finding that Appellee had the right to change the grading scale of the nursing program so long as the amendment was not made arbitrarily or capri-

ciously renders Appellant's promissory estoppel argument moot. This too is in keeping with the ruling of the lower court in its summary judgment order.

student faces a difficult challenge in completing the program, caught between a limited schedule and a five year limit.

But in spite of the scheduling obstacles created by the school, Ms. Bender still completed the program, and would have successfully graduated if the school had applied the same rules her last semester that it had established at the beginning. Instead, Ms. Bender finds herself with her degree not quite complete, and with no opportunity to complete it. After spending several years of her life working toward the goal of a degree, she has been told by the school to try something else.

Obviously it is important for all of Ms. Bender's potential future patients that she be well educated and well trained. But I don't believe that the difference between a 70 and a 75 necessarily makes her a bad nurse. I imagine that there were other nursing students who finished the program one year before Ms. Bender did who scored between 70% and 75% in a class and still passed that class and graduated from the program. No reasonable person would suggest that such individuals, now nurses, should be sent back to school.

My comments in no way imply that a school should not have the ability to change the requirements of one of its programs. Education is a constantly changing endeavor, and schools must be free to incorporate new advances into their existing curriculum. However, if a school does make such a change, I feel it should allow students who began their study before that change to finish under the old rules, or it should at least make some allowance when that change prevents a student from graduating.

In short, I think that the school made a deal with Ms. Bender when it enrolled her and took her tuition money, and she should have had the benefit of that deal throughout her studies. The majority indicates that Ms. Bender held up her end, and I believe the school should have been required to hold up its end as well.

Therefore, I respectfully dissent.