338 S.E.2d 415

**Theresa D. FREEMAN, Pamela S. McDaniels, et al.,**

v.

**Maud Ann POLING Sheriff, Etc.,**

**No. 16316.**

Supreme Court of Appeals of West Virginia.

Dec. 20, 1985.

---

Franklin D. Cleckley, Morgantown, La-Verne Sweeney, Grafton, Robert M. Bastress, Morgantown, for appellants.

Gerald M. Fogg, Asst. Pros. Atty., Philippi, for appellee.

MILLER, Chief Justice:

We are asked on this appeal to determine whether the termination of certain county employees violated their constitutional due process rights. We find their rights not to have been violated.

In the 1976 election, incumbent Republican Donald Semmelman lost the sheriff's race to Democrat Virgil Poling. Poling died two weeks later and was replaced by his widow, Maud Ann Poling. Before Sheriff Poling took office on January 1, 1977, there were thirteen employees in the Sheriff's office including the four appellants. When she assumed the office, she verbally notified each of the appellants, and one other employee, that she would not be needing their services. She retained the other eight employees and hired new deputies in place of the appellants. When asked

by the appellants the reasons for their termination, Poling responded that she desired to bring in "people of her own." The evidence shows appellants, Theresa Freeman, Pamela McDaniels, and Larry Carpenter were Republicans and Howard Biller was a Democrat. They were replaced by four Democrats.

The appellants rely heavily on certain assurances made by Sheriff Semmelman with regard to the civil service system established in January, 1975, by the Barbour County Commission as authorized by W.Va.Code, 7–14–1, *et seq.* At the time of its adoption, the appellants Carpenter and Freeman were already deputy sheriffs. They were assured by Sheriff Semmelman that their jobs would be protected under the new civil service system as long as they passed the civil service examination. The appellants McDaniels and Biller were hired as deputies in 1976 with the same assurance by Semmelman that they would be covered under the civil service system. However, it is not disputed factually that neither McDaniels nor Biller had been approved by the Civil Service Commission. McDaniels had not even taken the civil service examination prior to being hired. Biller had taken the examination prior to his hiring, but he had the lowest score among the applicants and was never recommended by the Civil Service Commission. Freeman and McDaniels eventually took the civil service examination in 1976. Carpenter never took the examination and denied he had ever been told it was required for civil service protection.

The appellants protested their dismissals and requested a hearing before the Civil Service Commission of Barbour County. Before any hearings could be held, Poling obtained a writ of prohibition from the Circuit Court of Barbour County barring a hearing and preventing the Civil Service Commission from any further activity. The court found that the civil service system had not been properly adopted and, therefore, the Commission was without jurisdiction to hear the deputies' case. This decision made in a separate suit was never appealed.

The deputies then filed an action in the Circuit Court of Barbour County alleging political discrimination and denial of due process and seeking damages and reinstatement to their employment as deputies. The circuit court, without a jury, denied relief. The court held that none of the appellants had a legitimate expectation of continued employment because (1) the civil service system for Barbour County deputy sheriffs was unlawfully established and, therefore, the new sheriff was not bound to recognize or perpetuate the effects of an unlawful system; (2) even if the civil service system were lawfully established, none of the appellants came within the definition of a deputy sheriff as that term is defined in W.Va.Code, 7–14–2(a)(2), and, therefore, could not have legally qualified for civil service protection; (3) further, even if appellants fell within the definition of deputy sheriff, Biller and McDaniels were unlawfully hired in violation of the Civil Service Commission's procedures set forth in W.Va.Code, 7–14–11, and Carpenter failed to perfect his civil service coverage by not taking an examination as required by W.Va.Code, 7–14–9; (4) Sheriff Semmelman had no authority to bind his successors to unlawful promises of civil service coverage; and (5) appellants' reliance on Semmelman's promises was unreasonable. The court also held there was no political discrimination as to violate appellants' First Amendment rights to free expression of political beliefs.

The appellants contest all of these findings.

## I. PROPERTY INTEREST

The appellants appear to recognize the validity of the circuit court's ruling on the separate suit holding that the civil service system was improperly promulgated and, therefore, invalid.[1] No appeal has been taken from that decision. Their argument is that the existence of the civil service system prior to its invalidation was enough to create a sufficient property interest. However, the appellee, Poling, argues that even if the old civil service system could be deemed to have created some type of entitlement, the appellants could not obtain its benefits because they never met the standards imposed by the old civil service system.

In Syllabus Point 3 of *Waite v. Civil Service Comm'n*, 161 W.Va. 154, 241 S.E.2d 164 (1977), this Court held:

"A 'property interest' includes not only the traditional notions of real and personal property, but also extends to those benefits to which an individual may be deemed to have a *legitimate* claim of entitlement under existing rules or understandings." (Emphasis added).

In *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 561 (1972), the United States Supreme Court said property interests are not created by the Constitution, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." In *Perry v. Sindermann*, 408 U.S. 593, 602 n. 7, 92 S.Ct. 2694, 2700 n. 7, 33 L.Ed.2d 570, 580 n. 7 (1972), the Court reiterated the rule in *Roth* and emphasized that "If it is the law of Texas that a teacher in the respondent's position has no contractual or other claim to job tenure, the respondent's claim would be defeated."

█ Thus, although a government employee may have a reasonable basis for understanding terms of his employment, those understandings cannot override state law that defines the terms of employment. As stated in *Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684, 690 (1976): "A property interest in employment can, of course, be created by ordinance, or by an implied contract. In either case, however, the sufficiency of the claim of entitlement must be decided by reference to state law." (Footnotes omitted).

---

1. In their initial brief, the appellants state: "The Barbour County Circuit Court's invalidation of the Commission's civil service system for deputies certainly meant that the Sheriff was not bound to follow civil service requirements for *future* deputy appointments." (Emphasis in original).

Under West Virginia civil service law in effect at the time a civil service system was established for deputy sheriffs in Barbour County, civil service protection was provided only to those deputies as defined in W.Va.Code, 7–14–2(a)(2) (1971):

" 'Deputy sheriffs' or 'deputies' shall mean persons appointed by a sheriff as his deputies whose *sole* duties as such deputies are within the scope of active, general law enforcement and as such are authorized to carry deadly weapons, patrol the highways, perform police functions, make arrests or safeguard prisoners." (Emphasis added).[2]

The circuit court found that none of the appellants satisfied this statutory definition of deputy sheriffs entitled to civil service protection because their *sole* duties were not within the scope of active, general law enforcement. The appellants Freeman and McDaniels were employed primarily as clerical workers or bookkeepers in the tax office. Carpenter and Biller were employed primarily as dispatchers and jailors.

Furthermore, regardless of what they may have been told by Semmelman, the appellants could not have been brought under the civil service system unless the proper procedures had been followed. Those procedures are governed by W.Va.Code, 7–14–7 through –14. None of the appellants was hired in accordance with these provisions. Carpenter and Freeman were already hired as deputies at the time the county established a civil service system for deputy sheriffs. According to W.Va. Code, 7–14–9, any deputies employed when the civil service system is established must pass an examination within one year. Carpenter never took the examination and Freeman did not take the examination until after her one-year grace period.

Neither of the new employees, McDaniels nor Biller, hired by Sheriff Semmelman after the civil service system was in place, was hired from a list of recommendations by the Civil Service Commission as required by W.Va.Code, 7–14–11.

Under our civil service law, it is clear that none of the appellants met the objective criteria for civil service protection and therefore they did not have a legitimate claim of entitlement to continued employment. Where state law withholds entitlement to employment until certain conditions are met, the employee cannot acquire a property interest sufficient to invoke due process protection. *See Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

The appellants also contend that for due process purposes they had a protected property interest that arose from the fact that they had reasonably and detrimentally relied on the former sheriff's promise of civil service protection, and as a consequence, the succeeding Sheriff Poling is estopped from denying their employment rights. For support of this argument, the appellants rely on cases dealing with principles of promissory estoppel as supplying the consideration for a contract to make it enforceable. *E.g., North American Royal Coal Co. v. Mountaineer Developers, Inc.,* 161 W.Va. 37, 239 S.E.2d 673 (1977); *Cochran v. Ollis Creek Coal Co.,* 157 W.Va. 931, 206 S.E.2d 410 (1974); *First National Bank of Gallipolis v. Marietta Mfg. Co.,* 151 W.Va. 636, 153 S.E.2d 172 (1967).

We do not believe these cases are relevant to the facts of this case. Here the issue is whether promises of a public official that are contrary to the law can be enforced by someone who relies on them to his detriment. The appellants place substantial reliance on this language from the case of *State ex rel. Wells v. City of Charleston,* 92 W.Va. 611, 617, 115 S.E. 576, 578 (1922):

"Municipal authorities in some cases may be estopped from contesting the validity of their ordinances where they have granted privileges or rights under them and thereby induced or led the beneficiary into the belief that the ordinance was valid. This is particularly so when such person might otherwise ... be

---

**2.** In 1978, this section was amended and among other changes the word "sole" was changed to "primary."

called upon to sacrifice some personal or property right."

In that case, however, this Court held the municipality was not estopped from contesting the validity of its ordinance even though the relator and the City initially relied on the ordinance for authority to grant the relator a license to operate public buses. The ordinance was inconsistent with state law and this Court said: "The law is that when an ordinance is inconsistent with the statutes or general laws of the state, it will be null and void unless it emanates by virtue of the express grant of the state." 92 W.Va. at 617, 115 S.E. at 578–79.

▮ In the present case, the establishment of the civil service system and the promises of civil service protection were contrary to State law and involved a matter where the sheriff was acting in his governmental capacity. Ordinarily, unlawful or ultra vires promises are nonbinding when made by public officials, their predecessors or subordinates, when functioning in their governmental capacity. *West Virginia Public Employees Ins. Bd. v. Blue Cross Hospital Service, Inc.*, 174 W.Va. 605, 609, 328 S.E.2d 356, 360 (1985); Syllabus Point 1, *Samsell v. State Line Dev. Co.*, 154 W.Va. 48, 174 S.E.2d 318 (1970); *Cunningham v. County Court*, 148 W.Va. 303, 309–10, 134 S.E.2d 725, 729 (1964).

Recently, in Syllabus Point 2 of *West Virginia Public Employees Ins. Bd.*, we held:

"A state or one of its political subdivisions is not bound by the legally unauthorized acts of its officers and all persons must take note of the legal limitations upon their power and authority. *Cunningham v. County Court of Wood County*, 148 W.Va. 303, 310, 134 S.E.2d 725, 729 (1964)."

Furthermore, in *Cunningham*, 148 W.Va. at 309–10, 134 S.E.2d at 729, this Court summarized the law regarding governmental estoppel:

"The general rule is that an estoppel may not be invoked against a governmental unit when functioning in its governmental capacity, 31 C.J.S., Estoppel,

Sections 138–142, pages 675–719; Anno., 1 A.L.R.2d 338.

"A governmental unit is not estopped to deny the validity of *ultra vires* acts of its officers. 31 C.J.S., Estoppel, Section 143, page 719. See also 19 Am.Jur., Estoppel, Section 167, page 819; 7 M.J. Estoppel, Section 7, page 246. A state or one of its political subdivisions is not bound by the legally unauthorized acts of its officers; and all persons must take note of the legal limitations upon their power and authority. (Citations omitted)

"In accordance with a well settled principle, this Court has stated many times that the state and its political subdivisions are not bound, on the basis of estoppel, by the *ultra vires* or legally unauthorized acts of its officers in the performance of governmental functions." (Citations omitted).

This is consistent with the recent holding in *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 63, 104 S.Ct. 2218, 2226, 81 L.Ed.2d 42, 54 (1984), where the United States Supreme Court said "those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law." *See also Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). However harsh this rule may seem, it is supported by an important public policy consideration as noted in *Bollow v. Federal Reserve Bank of San Francisco*, 650 F.2d 1093, 1100 n. 7 (9th Cir.1981), *cert. denied*, 455 U.S. 948, 102 S.Ct. 1449, 71 L.Ed.2d 662 (1982), where the court said: "The rules are nevertheless necessary to ensure that the will of Congress is not thwarted by misguided government officials."

Several cases deal directly with promises made by public officials regarding a person's job tenure where the promises were contrary to the institution's personnel policy. In each instance the court concluded that such promises were not enforceable. *See Carducci v. Regan*, 714 F.2d 171, 177 (D.C.Cir.1983); *Smith v. Sorensen*, 748 F.2d 427, 431–32 (8th Cir.1984); *Davis v. Oregon State University*, 591 F.2d 493 (9th

Cir.1978); *Chambliss v. Foote*, 421 F.Supp. 12 (E.D.La.1976), *aff'd*, 562 F.2d 1015 (5th Cir.1977), *cert. denied*, 439 U.S. 839, 99 S.Ct. 127, 58 L.Ed.2d 137 (1978). Typical of the rationale utilized is this statement from *Carducci*, 714 F.2d at 177: "Any other rule would deprive the people of their control over the civil service, and leave the status and tenure of all employees to be governed by whatever arrangements incumbent administrators may agree to or prescribe."

Appellants also argue that even if they are not entitled to civil service protection, their reasonable and detrimental reliance gave rise to a due process property interest such that they, at least, are entitled to a hearing. They rely on *Kisner v. Public Service Comm'n*, 163 W.Va. 565, 258 S.E.2d 586 (1979), where this Court found the Public Service Commission deprived an individual of a property interest when it revoked his certificate authorizing him to operate an unlimited number of vehicles. This result was reached despite the fact that W.Va.Code, 24A–2–5(c), provided that no such certificate "shall be construed ... to confer any proprietary or property rights." We held "for the purpose of due process analysis only," the certificate holder enjoyed a property interest because "[h]e changed his position in reliance upon the original certificate authorizing him to operate an unlimited number of vehicles." 163 W.Va. at 569, 570, 258 S.E.2d at 588, 589.

We find appellants' reliance on *Kisner* is misplaced. In *Kisner*, we were not faced with the issue, as we are in the present case, of whether detrimental reliance on ultra vires representations gives rise to a due process property interest. In *Kisner*, the original permit was revoked not because the commission lacked authority to issue it, but because it was issued upon insufficient facts regarding the number of vehicles needed to meet the needs of the particular area.[3]

The appellants' claim that they are entitled to a hearing even if they are not entitled to civil service protection misperceives the issue. The purpose of the constitutional due process right to a hearing is to provide an opportunity for a person to vindicate his claim of entitlement. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 561 (1972). No constitutional interest is served by permitting one to vindicate an interest or right to which he has no claim.

The appellants advance a theory that the traditional rule against estopping the government is linked to and eroding with the doctrine of governmental immunity. *See generally* Annot., 77 A.L.R.3d 925 (1977); Annot., 1 A.L.R.2d 338, 340 (1948). They cite several cases in support of this theory. *E.g.*, *City of Long Beach v. Mansell*, 3 Cal.3d 462, 476 P.2d 423, 91 Cal. Rptr. 23 (1970); *Filipo v. Chang*, 62 Hawaii 626, 618 P.2d 295 (1980); *New-Mark Builders, Inc. v. City of Aurora*, 90 Ill. App.2d 98, 233 N.E.2d 44 (1967); *Department of Culture, Recreation & Tourism v. Fort Macomb Dev. Corp.*, 385 So.2d 1233 (La.App.1980); *State v. O'Connell*, 83 Wash.2d 797, 523 P.2d 872 (1974). We find these cases to be distinguishable from the cases at hand because they did not deal with ultra vires or unlawful acts by governmental officials. These cases dealt with lawful governmental conduct that induced a party to substantially rely on it and then the governmental entity radically shifted its position.[4]

---

**3.** Much the same flaw arises in appellants' reliance on *Major v. DeFrench*, 169 W.Va. 241, 286 S.E.2d 688 (1982), and *State ex rel. McLendon v. Morton*, 162 W.Va. 431, 249 S.E.2d 919 (1978). In these cases, we found the individuals to have met objective criteria set by their employer and thus they had an entitlement. There was no issue in these cases that the objective criteria were ultra vires or unlawful promises had been made on the part of the employer.

**4.** In *City of Long Beach*, the city had acquiesced over a period of many years in the substantial private development of tideland property. It then sought to litigate title to this area and was held to be estopped. *Filipo* involved the welfare department's sudden cancellation of a twenty-three-year-old policy regarding welfare assistance on the ground that there was a technical flaw in its original promulgation. In *New-Mark Builders*, the city had annexed two areas developed by the builder, but refused a contiguous third area asserting the failure to meet a new

We do not say that there can never be a situation where claims of estoppel might be upheld as we agree with this statement by the United States Supreme Court in *Heckler*, 467 U.S. at 60–61, 104 S.Ct. at 2224, 81 L.Ed.2d at 52:

"[W]e are hesitant, when it is unnecessary to decide this case, to say that there are *no cases* in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government." (Emphasis in original).

■ The appellants' reliance on Sheriff Semmelman's assurance can hardly be characterized as reasonable. It is difficult to conceive that they lacked even the rudimentary knowledge of how the civil service system operated. Carpenter never took the civil service examination, while his colleague did, but after the prescribed time period had elapsed. Biller took the test before he was formally hired, but ranked below others such that he was not recommended by the Civil Service Commission to be hired. Carpenter claimed that he was never aware an examination was required. In view of the small size of the deputy force, it strains credulity to conclude that they had a justified belief that they met the civil service requirements. This basis for disqualification is apart from their obvious statutory disqualification for not being solely engaged in "active general law enforcement." W.Va.Code, 7–14–2(a)(2) (1971).

We conclude the appellants had no legitimate expectation of continued employment and, therefore, were not denied a property interest without due process of law.

## II. LIBERTY INTEREST

The appellants contend they were denied a liberty interest without due process of

law. They rely primarily on our opinion in *Major v. DeFrench*, 169 W.Va. 241, 256, 286 S.E.2d 688, 697 (1982), where we said the law recognizes "a due process interest in continued public employment and in freedom from an arbitrary non-retention devoid of protective procedures." However, we did not hold in *Major* that all public employees have a protected *liberty* interest in continued employment. The quotation above, and upon which appellants rely, was merely a restatement, in general terms, of our relevant case law regarding due process applications in public employment situations. It was not intended to define a constitutional *liberty* interest, which we did in Syllabus Point 2 of *Waite v. Civil Service Comm'n*, 161 W.Va. 154, 241 S.E.2d 164 (1977):

"The 'liberty interest' includes an individual's right to freely move about, live and work at his chosen vocation, without the burden of an unjustified label of infamy. A liberty interest is implicated when the State makes a charge against an individual that might seriously damage his standing and associations in his community or places a stigma or other disability on him that forecloses future employment opportunities."

This principle was reiterated in *Major*, 169 W.Va. at 256, 286 S.E.2d at 697, where we recognized that a governmental discharge on charges that would damage the employee's reputation requires a hearing so that the employee can clear his name:

"Thus the government cannot dismiss an employee on charges that call into question her good name, or that impose a stigma upon an employee which could foreclose her freedom to pursue other employment opportunities, without providing the employee notice of the charges against her and a hearing in which the factual basis of the charges can be con-

condition which had not been made applicable to the first two. *O'Connell* involved municipalities acting in their proprietary rather than governmental capacity seeking to reclaim attorney's fees paid to the attorney general and they were held estopped. We have recognized the possibility of estoppel where the government is acting

in a proprietary function. *Martin v. Pugh*, 175 W.Va. 495, 503, 334 S.E.2d 633, 641 (1985); *Cunningham v. County Court, supra; Cawley v. Board of Trustees*, 138 W.Va. 571, 76 S.E.2d 683 (1953); *State ex rel. Wells v. City of Charleston*, 92 W.Va. 611, 617, 115 S.E. 576, 578 (1922).

tested. *Board of Regents v. Roth,* [408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) ]; *North v. West Virginia Board of Regents,* [160 W.Va. 248, 233 S.E.2d 411 (1977) ]."

■ We find nothing in the record that supports the appellants' claim of a loss of liberty arising out of Sheriff Poling's decision to replace the appellants with deputies of her own choice. She made no charges against any of the appellants that might seriously damage their standing and associations in their community or place a stigma or other disability on them that would foreclose future employment opportunities.

■ Courts are rather uniform in holding that an unexplained termination or discharge from employment does not create a sufficient stigma to invoke a liberty interest protection under *Roth* as the Fourth Circuit Court of Appeals held in *Bunting v. City of Columbia,* 639 F.2d 1090, 1095 (4th Cir.1981): "Certainly, a person who has been fired may be somewhat less attractive to other potential employers, but it would be stretching the concept too far to conclude that a person's liberty interest is impaired merely because he has been discharged. *See Board of Regents v. Roth,* 408 U.S. 564, 575 [92 S.Ct. 2701, 2708, 33 L.Ed.2d 548, 560] (1972)." *See Board of Curators v. Horowitz,* 435 U.S. 78, 83–84, 98 S.Ct. 948, 952, 55 L.Ed.2d 124, 131 (1978).

■ At her deposition, Sheriff Poling stated the reason she did not want to reappoint Carpenter was that she had heard from a fellow worker of Carpenter's that Carpenter had stolen a prisoner's money. She testified that she did not investigate the truth of the accusation and that she did not discuss the charge with Carpenter. Carpenter denied ever having taken a prisoner's money. There is no evidence in the record that Poling had ever communicated her suspicions about Carpenter to anyone. The circuit court held that the uncommunicated or unpublished charge did not stigmatize Carpenter. We agree.

In *Bishop v. Wood, supra,* the United States Supreme Court held there was no loss of liberty where the employer never communicated to anyone other than the discharged employee the reasons for the discharge. Without a public disclosure of accusations against Carpenter, he cannot claim that his "standing and associations in his community" have been damaged. *See Board of Regents v. Roth,* 408 U.S. at 573, 92 S.Ct. at 2707, 33 L.Ed.2d at 558. *See also McKnight v. Southeastern Pa. Trans. Auth.,* 583 F.2d 1229, 1238 (3d Cir.1978); *In re Selcraig,* 705 F.2d 789, 796 (5th Cir. 1983); *Landry v. Farmer,* 564 F.Supp. 598, 608 (D.R.I.1983); *Matthews v. Hesburgh,* 504 F.Supp. 108, 116 (D.D.C.1980), *aff'd,* 672 F.2d 895 (D.C.Cir.1981); *McCarthy v. Cortland County Community Action Program, Inc.,* 487 F.Supp. 333, 344 (N.D.N.Y.1980); *Northrop v. Kirby,* 454 F.Supp. 698, 701 (N.D.Ala.1978); *Butler v. Republic School Dist.,* 34 Wash.App. 421, 661 P.2d 1005 (1983).

## III. POLITICAL DISCRIMINATION

The appellants contend their political affiliations were a substantial and motivating factor in Poling's decision not to retain them as deputies. They rely on *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), and *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), which held it unlawful to discharge government employees in nonsensitive positions on the basis of their political affiliations. Furthermore, they rely on *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), which held that once a showing is made that an employee's exercise of First Amendment rights was a "substantial" or "motivating" factor in his discharge from government employment, the burden shifts to the appellee to prove, by a preponderance of the evidence, that the employee would have been discharged regardless of his constitutionally protected conduct. *See also Orr v. Crowder,* 173 W.Va. 335, 315 S.E.2d 593, *cert. denied,* 469 U.S. 981, 105 S.Ct. 384, 83 L.Ed.2d 319 (1984).

The appellants claim they submitted prima facie evidence of political discrimination, but the circuit court failed to shift the

burden of proof contrary to the requirements of *Mt. Healthy* and *Orr.* Instead, the court weighed all the evidence submitted by both parties before it reached its conclusion that the appellants' political affiliations were not a substantial or motivating factor. We believe the appellants' position to be unsound. It is not clear as yet whether the *Mt. Healthy* rule will be applied by the United States Supreme Court to political firings under *Elrod* and *Branti.* Even if it is applied, the *Mt. Healthy* test is primarily a burden shifting device utilized at trial to protect an injured plaintiff against a summary judgment or a directed verdict. *E.g., Daulton v. Affeldt,* 678 F.2d 487 (4th Cir.1982); *Tanner v. McCall,* 625 F.2d 1183 (5th Cir.1980); *Nekolny v. Painter,* 653 F.2d 1164 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982); *Douglas v. Galloway,* 568 F.Supp. 966 (S.D.W.Va.1983).

Here the appellants were accorded a full evidentiary hearing before the trial court without a jury. The court under its findings based on the entire record concluded that the plaintiffs/appellants had not proven a case of political firing. Because the case was not summarily disposed of by way of a summary judgment, directed verdict, or judgment notwithstanding a jury verdict, there is no issue with regard to the *Mt. Healthy* test. Rather, we use our customary standard for reviewing a trial court's findings sitting in lieu of a jury, as stated in Syllabus Point 1 of *McElwain v. Wells,* 174 W.Va. 61, 322 S.E.2d 482 (1984):

> " ' "A finding of fact made by a trial chancellor or by a trial court sitting in lieu of a jury will be given the same weight as the verdict of a jury and will not be disturbed by this Court on appeal unless the evidence plainly and decidedly preponderates against such finding." Syllabus Point 8, *Sanders v. Roselawn Memorial Gardens, Inc.,* 152 W.Va. 91, 159 S.E.2d 784 (1968).' Syllabus Point 1, *Trenton Construction Company, Inc. v. Straub,* 172 W.Va. 734, 310 S.E.2d 496 (1983)."

■ We find no error in the circuit court's finding. The appellants did not meet their burden of showing Poling's decision was motivated by the appellants' membership in the Republican Party. Appellant Biller was a Democrat, so clearly, as to him, political discrimination is not an issue. As evidence of political motivation, the appellants showed there were thirteen employees in the sheriff's department at the end of Semmelman's term. Of those, seven were Republicans, five were Democrats, and one was Independent. Poling terminated four Republicans and one Democrat and replaced them with five Democrats. According to the appellants, the other three Republicans and the one Independent were reappointed by Poling only because she thought she could not terminate them because two were covered by civil service, and the other two were employed with federal funds under the "CETA" program, which allows termination only for cause. Furthermore, the appellants rely on the fact that Poling said she did not retain the appellants because she wanted to bring in people of her own and from that they infer she meant Democrats.

■ The circuit court balanced those facts against other evidence that showed Poling was not motivated by political party affiliations. The court found that Poling did not retain Biller, a Democrat and that she kept one Republican because she had known him all his life. The court noted even after the civil service system was declared invalid she did not replace the Republicans with loyal Democrats. Furthermore, one Republican CETA worker was retained after her CETA funding had expired. The court also found that Poling did not know or make inquiries about the political affiliations of three of the Democrats she hired to replace the appellants. A finding was also made that she based her employment decisions on private interviews, her own knowledge of the employees selected, and recommendations of friends and advisors, one of whom was a Republican. The circuit court assessed the evidence and Poling's credibility as a witness and found no political motivations on

her part. We are satisfied that the circuit court's finding of fact on this issue is consistent with the evidence and certainly it is not plainly and decidedly against a preponderance of the evidence. The appellants failed to make a prima facie showing of political motivation.

Finally, the appellants argue that because the circuit court's factual findings were prepared for the court by defense counsel and adopted without significant changes, those findings should not receive the usual degree of appellate deference.

In Syllabus Point 1 of *South Side Lumber Co. v. Stone Construction Co.*, 151 W.Va. 439, 152 S.E.2d 721 (1967), we said that "[u]nder Rule 52(a) of the West Virginia Rules of Civil Procedure it is the duty of the trial court to make its findings of facts and it should not surrender or delegate that important function by any mechanical adoption of the findings prepared by counsel." However, in that case, we ultimately held the court's adoption of counsel-prepared findings "did not constitute error and such findings of facts, as so found by the court, should not be rejected, vacated or disturbed for that reason." 151 W.Va. at 442, 152 S.E.2d at 723.

In *Anderson v. City of Bessemer City*, 470 U.S. 564, 572, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518, 527 (1985), the United States Supreme Court recognized the "potential for overreaching and exaggeration on the part of attorneys preparing findings of fact," but held "even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous."

 After careful scrutiny of the record, we do not find the findings of the circuit court in this case to be clearly erroneous. The record shows appellants made no objection, either before or after the trial court's approval of the findings.

For all the foregoing reasons, we affirm the judgment of the Circuit Court of Barbour County.

Affirmed.