IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

Spring 2024 Term

**FILED**

**May 23, 2024**

released at 3:00 p.m.
ASHLEY N. DEEM, DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

_____

No. 23-ICA-265

_____

ST. JOSEPH'S HOSPITAL OF BUCKHANNON, INC. d/b/a ST. JOSEPH'S
HOSPITAL,
Respondent Below, Petitioner,

v.

STONEWALL JACKSON MEMORIAL HOSPITAL COMPANY,
Petitioner Below, Respondent,
and
WEST VIRGINIA HEALTH CARE AUTHORITY,
Respondent.

_____

Appeal from the West Virginia Health Care Authority
Certificate of Need File No. 23-7-12659-X

AFFIRMED
_____

Submitted:  March 19, 2024
Filed:  May 23, 2024

Alaina N. Crislip, Esq.
Neil C. Brown, Esq.
Jackson Kelly PLLC
Charleston, West Virginia
Counsel for Petitioner

Thomas G. Casto, Esq.
Webster J. Arceneaux, Esq.
Hannah Wright, Esq.
Lewis Gianola PLLC
Charleston, West Virginia
Counsel for Respondent Stonewall
Jackson Memorial Hospital Company

Patrick Morrisey, Esq.
Attorney General
Heather Connolly, Esq.
Assistant Attorney General
Frankie Dame, Esq.
Assistant Solicitor General
Michael R. Williams, Esq.
Principal Deputy Solicitor General
Charleston, West Virginia
Counsel for Respondent West
Virginia Health Care Authority

CHIEF JUDGE SCARR delivered the Opinion of the Court.
JUDGE LORENSEN dissents and reserves the right to file a separate opinion.

SCARR, CHIEF JUDGE:

Petitioner St. Joseph's Hospital of Buckhannon appeals the Amended Decision on Request for Ruling on Reviewability issued by Respondent West Virginia Health Care Authority on July 12, 2023, holding that a Certificate of Need is not required for Respondent Stonewall Jackson Memorial Hospital's proposed relocation. Petitioner contends that the Authority's decision misapplies the statute enumerating what types of proposed health care projects require a Certificate of Need. Petitioner also contends that the Health Care Authority lacks the power to amend their original decision in this matter, and thus the amended decision is *ultra vires*, and thus invalid.

Having reviewed the parties' arguments, the administrative record on appeal, and the controlling law, we affirm the Health Care Authority's July 12, 2023, Amended Decision on Request for Ruling on Reviewability. We affirm for the reasons fully discussed below, on the basis that the Health Care Authority's decision is a reasonable and permissible interpretation of a statute that is ambiguous when applied to the proposed relocation project at issue here.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Stonewall Jackson Memorial Hospital ("Stonewall") is a 70-bed acute care hospital located on the western edge of Weston, located in Lewis County, West Virginia. Stonewall's current facility was built in 1972, over fifty years ago. Because of the facility's age, Stonewall sought to replace its current facility with a new, state of the art, 29-bed

1

facility to be located at the intersection of Interstate 79 and United States Highway 33 E., 4.2 miles to the southeast of its current site.

St. Joseph's Hospital of Buckhannon ("St. Joseph's") is a 25-bed critical access hospital ("CAH") located in Buckhannon, Upshur County, West Virginia, where it is the sole community hospital. CAH is a designation by the United States Department of Health and Human Services, Centers for Medicare & Medicaid Services, which enables a qualified rural hospital to be reimbursed on a cost-basis for providing services to Medicare and Medicaid patients, as opposed to being reimbursed on a prospective payment basis. Essentially, rather than being paid a pre-determined fixed amount for hospital services, a CAH is paid primarily on the basis of the costs it incurs. St. Joseph's struggled financially prior to its CAH designation in 2014, but its financial health has improved since its CAH designation.[1] To qualify for CAH status, St. Joseph's must not be located closer than 15 mountainous terrain miles from another hospital. Although St. Joseph's is currently more than 15 miles from any hospital, allowing Stonewall to relocate to its proposed relocation site would place it within 15 miles of St. Joseph's, thereby eliminating St. Joseph's eligibility for CAH designation.

---

[1] In 2015, St. Joseph's became affiliated with United Hospital Center and West Virginia University Medicine.

The procedural history of this case is multilayered. On September 13, 2021, Stonewall's Certificate of Need ("CON") application was received by the West Virginia Health Care Authority ("the Authority"). The cost of the proposed relocation was $55,950,000.00 To meet Stonewall's current needs and accommodate future growth, Stonewall considered alternatives to relocation, such as large-scale renovations of the existing facility, maintaining the status quo, and construction of a new hospital. Stonewall ultimately determined that construction of new hospital was the best solution. The reasons put forth for moving the site of the hospital were the current site's poor accessibility, constraints to expansion, and space and layout deficiencies. On October 14, 2021, St. Joseph's filed its request for affected person status as well as a request for a public hearing. St. Joseph's asserted that it provided similar services to those proposed in the CON application and that it would be significantly affected by the proposed relocation project.

On June 13, 2022, the Authority issued the first decision regarding Stonewall's CON, which was appealed to this Court. *See Stonewall Jackson Mem'l Hosp. Co. v. St. Joseph's Hosp. of Buckhannon, Inc.*, No. 22-ICA-147, 2023 WL 4197305 at *1 (W. Va. Ct. App. June 27, 2023) (memorandum decision). Relevant to that appeal, the Authority held that although the proposed relocation may be the superior alternative in terms of cost, efficiency, and appropriateness for Stonewall, the Authority must also determine whether the proposed project is the superior alternative for an affected person (like St. Joseph's) and the citizens of West Virginia. The Authority found that Stonewall's proposed relocation would cause St. Joseph's to lose its CAH status, which would have a

3

significant financial impact upon St. Joseph's. Further, the Authority found that Stonewall did not prove the impracticability of developing alternative site locations, noting that Stonewall had not explored any other sites for the project other than the proposed location. The Authority concluded that Stonewall's application should be denied because Stonewall failed to demonstrate that superior alternatives to the services proposed did not exist within the state and that the development of alternatives was not practicable as required by West Virginia Code §16-2D-12(b)(1) (2016). On June 27, 2023, this Court issued a memorandum decision affirming the Authority's order, holding, among other things, that "[b]ased upon a review of the record and the deference given to the Authority because of its institutional expertise, we find no error in the Authority's determination that Stonewall did not provide sufficient evidence to show that superior alternatives do not exist and that the development of alternatives is not practicable." *Id.* at \*4.

However, between the time the CON application was decided by the Authority and its subsequent appeal to this Court, the West Virginia Legislature enacted Senate Bill 613, which significantly raised the CON expenditure minimum. Specifically, West Virginia Code § 16-2D-2(15) (effective March 10, 2023) (amended January 22, 2024), titled "Definitions," changed the definition of "Expenditure minimum" to mean "the cost of acquisition, improvement, expansion of any facility, equipment, or services including the cost of any studies, surveys, designs, plans, working drawings, specifications

4

and other activities, including staff effort and consulting at and above" from $5 million to $100 million.[2]

Despite the pending litigation, on March 29, 2023, Stonewall filed with the Authority a request for a determination of reviewability ("RDOR"), pursuant to West Virginia Code § 16-2D-7 (2016), because of the increase to the CON expenditure minimum. Stonewall argued that the proposed construction of its new hospital no longer requires a CON because the capital expenditure associated with the project is less than the new expenditure minimum. On April 5, 2023, St. Joseph's intervened to oppose Stonewall's RDOR, arguing that despite the increase in the expenditure minimum, Stonewall's application is subject to CON review because the relocation project contemplates a substantial change in bed capacity under West Virginia Code § 16-2D-8(a)(5) (2023) and further because the project involves the construction and/or development of a health care facility, under West Virginia Code § 16-2D-8(a)(1) (2023).

The Authority entered its initial decision on Stonewall's RDOR on June 15, 2023, before it entered its July 12, 2023, Amended Decision on Request for Ruling on Reviewability ("Amended Decision"). The two decisions are largely the same, with the Amended Decision removing one footnote, adding more detail in findings of fact two and

---

[2] Although not relevant to this appeal, it should be noted that the statutory expenditure minimum is set to increase based on the DRI inflation index. The capital expenditure minimum for calendar year 2024 is $104,300,000.00.

seven, and eliminating conclusion of law four in the original decision which stated: "The Authority has not generally taken up the issue of a change in bed capacity when making determinations of reviewability when the project is the complete relocation of a healthcare facility if the facility is in the same service area and the minimum capital expenditure is not exceeded." Both the initial and Amended Decision found that in the previous CON matter, Stonewall proposed to reduce the number of beds from 70 to 29. However, in the RDOR there is no such reduction in bed capacity identified. Further, since the cost of the project was under the minimum expenditure, the Authority found that CON review was not required. It is from the July 12, 2023, Amended Decision that St. Joseph's now appeals.[3]

## II. STANDARD OF REVIEW

This Court has jurisdiction over this appeal pursuant to West Virginia Code § 51-11-4 (2022).[4] Pursuant to West Virginia Code §§ 16-2D-16a (2021) and 29A-5-4(g)

---

[3] This Court held Rule 20 oral argument on the appeal on March 19, 2024, at Fairmont State University as part of its "ICA on Campus" initiative.

[4] The Court acknowledges that our colleague has filed a dissent to our decision in this case. The dissent contends that we lack jurisdiction here because the Authority's Amended Decision is not a final decision in a certificate of need review, which we have jurisdiction over pursuant to West Virginia Code § 16-2D-16a(a)(2) (2021). The dissent's view is that the Authority's determinations of a proposed project's reviewability under West Virginia Code § 16-2D-7 (2016) are separate and distinct from certificate of need review decisions, and thus fall outside of our limited appellate jurisdiction. However, we find that there is ample statutory support for this Court's jurisdiction over a determination of reviewability by the Authority. This Court has jurisdiction over "[f]inal judgments,

6

(2021), our standard of review for certificate of need decisions issued by the Authority is

set forth as follows:

> The court may affirm the order or decision of the agency or remand the case for further proceedings. It shall reverse, vacate, or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decision, or order are:
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority or jurisdiction of the agency;
> (3) Made upon unlawful procedures;
> (4) Affected by other error of law;
> (5) Clearly wrong in view of the reliable, probative, and substantial evidence on the whole record; or
> (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

W. Va. Code § 29A-5-4(g) (2021). Further, issues involving "'[i]nterpreting a statute or an

administrative rule or regulation presents a purely legal question subject to *de novo*

---

orders, or decisions of an agency or an administrative law judge entered after June 30, 2022, heretofore appealable to the Circuit Court of Kanawha County pursuant to § 29A-5-4 or any other provision of this code." W. Va. Code § 51-11-4(b)(4) (2022). Therefore, if a determination of reviewability by the Authority is reviewable under West Virginia Code § 29A-5-4 (2021), this Court has appellate jurisdiction. In addition, declaratory rulings by an agency are "subject to review before the court and in the manner hereinafter provided for the review of orders or decisions in contested cases," which is § 29A-5-4. West Virginia Code § 29A-4-1 (2024). Also, West Virginia Code § 16-29B-13 (2024) states that a "final decision" of the Authority is reviewable under § 29A-5-4, without any reference or limitation of review to a "certificate of need review." Moreover, West Virginia Code § 16-2D-2 (2024) does not provide a specific definition for a final decision nor certificate of need review such that a § 16-2D-7 determination of reviewability would be excluded from our jurisdiction over final decisions in a certificate of need review under § 16-2D-16. Thus, we find that one or more of the aforementioned statutes confer this Court with jurisdiction over this case.

7

review.'" Syl. Pt. 4, *Amedisys W. Va., LLC v. Pers. Touch Home Care of W. Va., Inc.*, 245 W. Va. 398, 859 S.E.2d 341 (2021) (quoting Syl. Pt. 2, *Steager v. Consol. Energy, Inc.*, 242 W. Va. 209, 832 S.E.2d 135 (2019)). With this standard in mind, we address the parties' arguments.

## III. DISCUSSION

The issues facing this Court are twofold: we must ascertain whether the Authority was correct to determine that Stonewall's proposed relocation does not require a CON, and we must also determine whether it was within the Authority's power to issue its July 12, 2023, Amended Decision. To perform this analysis, we must first determine what deference, if any, the Authority's statutory interpretations are entitled to receive. After determining the appropriate level of deference we must give, we must analyze whether the Authority's statutory interpretations regarding Stonewall's proposed relocation fall within that standard. Then, we will proceed to analyze what authority the Authority had to amend their decision, and determine whether the Amended Decision was *ultra vires*.

Administrative agencies are a prominent feature of the modern state, allowing the state's executive branch to interpret, apply, and enforce the legislature's broadly worded and generalized statutes to highly specialized and technical aspects of society. To perform this role, agencies are delegated some of the legislature's power to govern and regulate certain subject areas and to enforce certain statutes.

8

> The cornerstone of administrative law is derived from the principle that the legislature may declare its will and, after fixing a primary standard, endow administrative agencies with the power to fill gaps in the legislative product by prescribing rules and regulations that are consistent with the enabling legislation.

73 C.J.S. *Public Administrative Law and Procedure* § 108 (2024). Agencies are typically the state's repository of technical expertise and knowledge on a given subject, and because agency employees usually serve for much longer periods than elected officials, often have a significant amount of experience to complement their subject matter expertise. In recognition of this purpose and expertise, courts often give deference to an agency's interpretation of an ambiguous statute within their regulatory purview. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984).[5]

We have adopted the principles set forth in *Chevron*, as illustrated by the instructive Supreme Court of Appeals of West Virginia ("SCAWV") case *Appalachian Power Co. v. State Tax Dep't of W. Va.*, 195 W. Va. 573, 466 S.E.2d 424 (1995). *Appalachian Power Co.* provides that if a statute is constitutionally valid and clear as to its intent, the need for further review does not arise; it is the court's duty to apply the statute

---

[5] Although *Chevron* has been called into question, as of this decision *Chevron* and its state law progeny are good law. *See Appalachian Power Co. v. State Tax Dep't of W. Va.*, 195 W. Va. 573, 466 S.E.2d 424 (1995); *see also* Caleb B. Childers, *The Major Question Left for the Roberts Court, Will Chevron Survive?*, 112 KY. L.J. 373, 391–92 (2024).

as written.[6] *See id.* at 586, 466 S.E.2d at 437. In this first step of the *Chevron* analysis, the agency's interpretation is given no deference, as the court must primarily look to the plain meaning of the "particular statutory language at issue, as well as the language and design of the statute as a whole." *Id.* at 586, 466 S.E.2d at 437. (quoting *K mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291 (1988)). If the plain meaning of the statutory language does not make the legislature's will clear, the court next examines extrinsic sources, such as the legislative history and the statute's overarching design, in search of an unmistakable expression of legislative intent. *Id.* at 587, 466 S.E.2d at 438. It should be noted that *Appalachian Power Co.* cautions courts to only consider extrinsic sources with skepticism, requiring that they be explicatory such that, when considered in concert with the statutory language, they reveal "an unequivocal answer to the interpretive question." *Id.* at 587, 466 S.E.2d at 438.

If the first step of the *Chevron* analysis does not "discern an unmistakably clear expression of legislative intent," the court must move on to the second step, analyzing

---

[6] It should be noted that *Appalachian Power Co.*'s analysis was written to review an agency regulation, and not a statute. However, as it pertains to the case at hand, this is a distinction without a difference. In West Virginia, legislative regulations, those which affect private rights, privileges, or interests, are enacted into law by the Legislature, effectively turning the agency's regulation into a statute. *See Appalachian Power Co.*, 195 W. Va. at 583, 466 S.E.2d at 434. Accordingly, courts give legislative regulations that have been appropriately enacted by the Legislature and statutes the same controlling weight. *See id.* at 585, 466 S.E.2d at 436.

the agency's interpretation of the statute. *Id.* at 587–88, 466 S.E.2d at 438–39. Deference to the agency looms large at this stage; if the agency's interpretation flows rationally from the statute, the court cannot displace it. *Id.* at 588, 466 S.E.2d at 439. "Interpretations of statutes by bodies charged with their administration are given great weight unless clearly erroneous." Syl Pt. 7, *Lincoln Cnty. Bd. of Educ. v. Adkins*, 188 W. Va. 430, 424 S.E.2d 775 (1992). The SCAWV instructs courts to "not override administrative agency decisions, of whatever kind, unless the decisions contradict some explicit constitutional provision or right, are the results of a flawed process, or are either fundamentally unfair or arbitrary." *Frymier-Halloran v. Paige*, 193 W. Va. 687, 694, 458 S.E.2d 780, 787 (1995). Absent clear legislative intent to the contrary, we must afford deference to a reasonable and permissible construction of a statute by an agency with policymaking authority regarding the statute. *Sniffin v. Cline*, 193 W. Va. 370, 374, 456 S.E.2d 451, 455 (1995).

We now apply *Chevron*'s analysis to the case before us. Here, St. Joseph's disputes two of the Authority's interpretations regarding West Virginia Code § 16-2D-8 (2023), which establishes which proposed health care service projects require a CON, regardless of whether the capital expenditure meets the $100 million expenditure minimum threshold triggering a CON requirement under West Virginia Code § 16-2D-2(15) (2024). Specifically, St. Joseph's contends that Stonewall's proposed relocation requires a CON despite the planned capital expenditure being under the expenditure minimum because the relocation would result in the construction of a health care facility under West Virginia Code § 16-2D-8(a)(1) (2023), and a "substantial change to the bed capacity" under West

11

Virginia Code § 16-2D-8(a)(5) (2023). Section 16-2D-8(a)(1) states that "[t]he construction, development, acquisition, or other establishment of a health care facility" requires a CON, and § 16-2D-8(a)(5) states that "[a] substantial change to the bed capacity of a health care facility with which a capital expenditure is associated" requires a CON.

The first step in our analysis is to examine the statutory language. If the statute's intent regarding the issue at hand is unequivocally clear from its language, we need no further review; our imperative would be to apply the statute as written. *See Appalachian Power Co.*, 195 W. Va. at 586, 466 S.E.2d at 437. Therefore, we must determine whether the language at issue here clearly decides whether Stonewall's proposed relocation is a "construction, development, acquisition, or other establishment of a health care facility" or entails a "substantial change to the bed capacity."

Turning to West Virginia Code § 16-2D-8(a)(1) (2023), the statutory language is ambiguous when applied to a relocation plan like Stonewall's. St. Joseph's straightforwardly argues that because Stonewall's relocation entails constructing the new facility, a CON is unambiguously required by § 16-2D-8(a)(1). Although Stonewall clearly plans to construct and develop a health care facility, we cannot ignore the last portion of the statute, which describes the previous terms "construction, development, [and] acquisition" as means of establishing a health care facility. Our rules of statutory construction instruct us that "[e]ach word of a statute should be given some effect and a statute must be construed in accordance with the import of its language." Syl. Pt. 6, *State*

12

*ex rel. Cohen v. Manchin*, 175 W. Va. 525, 527, 336 S.E.2d 171, 173 (1984). Although a relocation plan necessarily entails the physical construction and development of a health care facility, it cannot be so plainly said that such a relocation "establishes" a health care facility. The relevant definitions of "establish" include: "to institute (something, such as a law) permanently by enactment or agreement," "to bring into existence," and "to bring about, effect." *Establish*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/establish (last visited Apr. 25, 2024). The common factor of these definitions is the characteristic of newness; one does not "establish" something that is already in existence. We cannot say that § 16-2D-8(a)(1) clearly and unequivocally describes a relocation, because in such a plan the subject's existence does not end so that it might be established, it merely moves from one location to another. Therefore, in the context of this case, West Virginia Code § 16-2D-8(a)(1) (2023) is ambiguous.

To decide whether West Virginia Code § 16-2D-8(a)(5) (2023) clearly and unequivocally applies here, the sole question we must answer is whether Stonewall's relocation plan entails a "substantial change to the bed capacity," which is defined as follows:

> any change, associated with a capital expenditure, that increases or decreases the bed capacity or relocates beds from one physical facility or site to another, but does not include a change by which a health care facility reassigns existing beds.

W. Va. Code § 16-2D-2(45) (2024). St. Joseph's contends that § 16-2D-8(a)(5) unambiguously requires a CON here for two reasons. First, it contends that by relocating

13

the beds into the new facility, Stonewall plans a "relocation" under the substantial change definition. Second, St. Joseph's claims that Stonewall's proposed relocation would result in a reduction in its bed capacity, based upon Stonewall's 2021 CON, where the proposed new facility would only have 29 beds.[7] Nothing in the record, briefing, and arguments indicates that Stonewall plans to reduce or increase the amount of beds it has available from the 70 it currently maintains, so that provision of the "substantial change to the bed capacity" definition is not implicated. On the other hand, a relocation of a health care facility does necessarily entail physically relocating beds "from one physical facility or site to another" as they are moved into the new facility. However, a holistic view of the "substantial change to the bed capacity" definition introduces ambiguity as to whether the bed relocation language applies here, as it excludes from the definition "a change by which a health care facility reassigns existing beds." Although a relocation such as Stonewall's does require physically moving beds, it is ambiguous as to whether this is a "substantial change to the bed capacity" because relocating beds from "one physical facility or site to another" implies the simultaneous existence of multiple facilities, while the relocation here would permanently move the beds out of the old facility and into a new one. In addition, the relocation here could plausibly be excluded from the "substantial change to the bed

---

[7] St. Joseph's points to the proposed capital expenditure being the same in both this matter and in the 2021 CON as evidence that the bed capacity in Stonewall's proposed new facility will be reduced. Essentially, they argue that it is impossible for Stonewall's proposed facility here to have 70 beds when it costs the same as when it was projected to have 29 beds. Stonewall addressed this apparent discrepancy, explaining that the original reduction in beds was required for CON approval, and they had budgeted the facility to expand after the relocation.

capacity" definition as a mere reassignment of the beds from the old facility to the new one. Therefore, we conclude that West Virginia Code § 16-2D-8(a)(5) (2023) is ambiguous as applied to Stonewall's proposed relocation.

Having found West Virginia Code § 16-2D-8 (2023)'s application to Stonewall's proposed relocation ambiguous, we are instructed to next consider, with a healthy dose of skepticism, external sources such as the legislative history and overall statutory design to see whether such an addition to the statutory language "reveals an unequivocal answer to the interpretive question." *Appalachian Power Co.*, 195 W. Va. at 587, 466 S.E.2d at 438. Our mandatorily skeptical review of § 16-2D-8's legislative history and the overall CON statutory scheme reveals nothing that speaks to the precise issues presented by this case. Indeed, the Legislature's dramatic increase of the "expenditure minimum" from $5 million to $100 million only suggests an intention to shrink the scope of projects that would require a CON. Although that general intent may cut against applying the CON requirement here, evidence of a general intent is a far cry from unequivocally answering the interpretive question before us. Because nothing in the extrinsic sources extinguishes the aforementioned ambiguities created by the statutory language, we cannot say that extrinsic sources unequivocally answer the question of West Virginia Code § 16-2D-8 (2023)'s application to Stonewall's proposed relocation.

Our two-pronged review of West Virginia Code § 16-2D-8 (2023) having found the statute's application to be ambiguous in this case, we now proceed to the highly

15

deferential second step of *Chevron*'s analysis. Courts will give deference to a reasonable and permissible construction of a statute by an agency with policymaking authority regarding the statute. *Sniffin*, 193 W. Va. at 374, 456 S.E.2d at 455. If the agency's interpretation flows rationally from the statute, the court cannot displace it. *See Appalachian Power Co.* 195 W. Va. at 588, 466 S.E.2d at 439. With this deferential standard in mind, we now analyze the Authority's interpretations in this case. As an initial matter, we take note of the fact that the Authority has been delegated with policymaking authority to administer the CON program. W. Va. Code § 16-2D-3(a) (2017). As stated in its initial and Amended Decisions, the Authority's interpretation of West Virginia Code §§ 16-2D-8(a)(1) (2023) and 16-2D-8(a)(5) (2023) is that neither provision applies whenever one is replacing and relocating the same services in the same service area, and such a proposal is only subject to a CON when it exceeds the minimum capital expenditure. As we consider this interpretation, we must bear in mind that the Authority's position need not be the only possible or most optimal interpretation of the statute, it needs only to be a reasonable one. *See Sniffin*, 193 W. Va. at 374, 456 S.E.2d at 455.

The Authority's interpretation of West Virginia Code § 16-2D-8(a)(1) (2023) that a relocation is not a "construction, development, acquisition, or other establishment of a health care facility" is a reasonable interpretation of the statute, following the imperative to give effect to each and every word of a statute. Here, the Authority's construction of § 16-2D-8(a)(1) is that the words "or other establishment" excludes a relocation because no new facility is being established, a pre-existing one is just moving into a new building. In

16

addition to being a rational reading on its face, the Authority's interpretation accords with one of the stated purposes of the CON program, to "avoid unnecessary duplication of health services," as it allows a health care provider to upgrade their facilities without CON approval, but requires it for one seeking to establish a new facility. *See* W. Va. Code § 16-2D-1 (2016).

The Authority's interpretation that a relocation is not a "substantial change to the bed capacity" of the health care facility is also a reasonable construction of West Virginia Code § 16-2D-8(a)(5) (2023). Although the substantial change of beds definition includes relocating beds from one physical facility or site to another, it excludes a health care facility reassigning existing beds. W. Va. Code § 16-2D-2(45) (2024). Here, the Authority has merely concluded that in a relocation, one reassigns the existing beds to the new facility, excluding a relocation from being a "substantial change to the bed capacity." This interpretation has a commonsense logic, as in such a relocation, the number of available beds, the "bed capacity," will not change, so a relocation should not be considered a "substantial change to the bed capacity." Also, the Authority's interpretation here furthers the purpose of promoting the continued accessibility to high quality health care services by incentivizing a provider to maintain their bed capacity when relocating to a different facility. *See* W. Va. Code § 16-29B-1 (2016).

We conclude that both of these interpretations are exactly the sort of reasonable interpretations that we are forbidden from displacing. The Authority's

17

interpretations rationally flow from the language of the statute and accord with its intent and purposes of promoting access to high-quality health care while discouraging duplicative services by allowing Stonewall, without a CON, to relocate from its 50-year-old facility into a new modern one while maintaining bed capacity. Therefore, we defer to the Authority's interpretations of § 16-2D-8 and will not overrule its conclusion that Stonewall's proposed relocation project is not subject to a CON.[8]

St. Joseph's also argues that the Authority was without authority to issue its Amended Decision on July 12, 2023, after it had already issued a decision on June 15, 2023, regarding Stonewall's RDOR. Petitioner contends that this alleged absence of authority to do so renders the Authority's Amended Decision as *ultra vires* and therefore invalid. "*Ultra vires* means that the action taken was beyond the power or authority given to the actor. *Ultra vires*, BLACK'S LAW DICTIONARY [11th ed. 2019]." *State v. Chase Securities, Inc.*, 188 W.Va. 356, 358 n.3, 424 S.E.2d 591, 593 n.3 (1992). *Ultra vires* acts or promises by an agency are ineffective and nonbinding, as they are by definition outside of the scope of whatever power the agency or its officials have been delegated to act with. *See Bd. of Educ. of Wyoming v. Dawson*, 249 W. Va. 211, ___, 895 S.E.2d 66, 72 (2023);

---

[8] It should be noted that the Authority has consistently held the position that a complete relocation is not subject to a CON. Although the expenditure minimum caused any substantial project proposals to require a CON, this position can be seen in the Authority's decisions regarding proposed relocations that had an expenditure below the $5 million expenditure minimum. *See In re: Select Specialty Hospital – Charleston, Inc.*, CON File No. 06-3-8441-X; *In re: Raleigh General Hospital*, CON File No. 98-1-6531-X.

Syl. Pt. 3, *Freeman v. Poling*, 175 W. Va. 814, 815, 338 S.E.2d 415, 417 (1985). "An administrative agency's reconsideration of its own final order before judicial review is not valid unless the agency was given the authority under a statute or administrative rule to do so." *Reed v. Thompson*, 235 W. Va. 211, 214–15, 772 S.E.2d 617, 620–21 (2015).

To determine whether the Amended Decision was *ultra vires*, we must analyze what power the Authority had to review and amend its original decision.

> Whether an administrative agency has authority under a statute or administrative rule to reconsider, revoke, or amend its final order entails a two-part inquiry. *See Atl. Greyhound Corp. v. Pub. Serv. Comm'n,* 132 W.Va. 650, 659–61, 54 S.E.2d 169, 174–75 (1949). The first question is whether an agency's power to reconsider its own final order is expressly or impliedly granted by statute. *Id.* at 659–660, 54 S.E.2d at 175. If not, the second inquiry is whether the following two conditions are met: (a) the Legislature granted the agency authority to adopt administrative rules of procedure; and (b) the agency adopted an administrative rule allowing it to reconsider its own final orders. *Id.* at 661, 54 S.E.2d at 175. If an agency has authority to reconsider its own final order under an administrative rule (as opposed to a statute), the scope of the agency's authority is strictly limited to what is contained in the rule.

*Id.* at 215, 772 S.E.2d at 621. *Reed* instructs us to first analyze whether the power to review and amend its own order was granted to the Authority by statute or rule. If this analysis reveals that the agency was granted such a review power, the inquiry ends. *Id.*

A review of the relevant statutes concerning the review and modification of decisions reveals that the Authority is authorized to correct clerical mistakes under West Virginia Rule of Civil Procedure ("WVRCP") 60(a). Typically, a decision of the board is

final unless reversed, vacated, or modified pursuant to West Virginia Code § 16-29B-13 (2024).[9] W. Va. Code § 16-29B-12 (2024). West Virginia Code § 16-29B-13(b) (2024) then directs the agency, for the purposes of administrative review of board decisions, to conduct its proceedings "in conformance with the West Virginia Rules of Civil Procedure for Trial Courts of Record and the local rules for use in the civil courts of Kanawha County," authorizing clerical corrections through WVRCP 60(a). *Id.* Rule 60(a) reads as follows:

> Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders. During the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed in the appellate court, and thereafter while the appeal is pending may be so corrected with leave of the appellate court.

W. Va. R. Civ. P. 60(a). WVRCP 60(a) allows for the court to correct, *sua sponte*, clerical errors made through oversight or omission which are part of the record and do not adversely affect the rights of the parties or alter the substance of the order, judgment or record beyond what was intended. Syl Pt. 3, *Johnson v. Nedeff*, 192 W. Va. 260, 261, 452 S.E.2d 63, 64 (1994). The Amended Decision, in addition to correcting typographical errors, removed one footnote that erroneously stated that Stonewall planned to reduce their bed capacity,

---

[9] The "board" that these statutes refer to is the Authority's Board of Review, which serves as its adjudicatory body and conducts all of the Authority's hearings. W. Va. Code § 16-29B-5 (2024).

added more detail in findings of fact numbers two and seven,[10] and eliminated conclusion of law number four, which stated: "The Authority has not generally taken up the issue of a change in bed capacity when making determinations of reviewability when the project is the complete relocation of a healthcare facility if the facility is in the same service area and the minimum capital expenditure is not exceeded." We find that the changes made from the Authority's original June 15, 2023, Decision to the July 12, 2023, Amended Decision do not affect the rights of the parties, nor do they alter the substance of the decision. These changes rectify errors on the Authority's part, and clarify the Authority's decision that a relocation that does not trigger the $100 million expenditure minimum is not subject to CON review. Considering that the Authority sits in the place of the court in the CON context, we believe that these are appropriate amendments under WVRCP 60(a). *See* W. Va. Code § 16-29B-12 (2024); W. Va. Code § 16-29B-8 (2022).

However, WVRCP 60(a) also states "[d]uring the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed in the appellate court, and thereafter while the appeal is pending may be so corrected with leave of the appellate court." W. Va. R. Civ. P. 60(a). Here, the Authority's original decision was issued on June 15, 2023, St. Joseph's filed its notice of appeal in this Court on June 21, 2023, and this

---

[10] The detail added to finding of fact number two is the difference in procedural posture between the original CON review that governed Stonewall's 2022 appeal and the RDOR that governs the instant appeal. *See* W. Va. Code §§ 16-2D-7 and 16-2D-13 (2024). The addition to finding of fact seven clarifies that Stonewall does not plan to reduce their bed capacity in their proposed relocation.

21

Court entered an order docketing the case for appeal on June 28, 2023. The Authority included the July 12, 2023, Amended Decision in the administrative record it presented to this Court on July 18, 2023. No facts indicate that the Authority sought leave from this Court prior to including the Amended Decision in the administrative record. On July 25, 2023, St. Joseph's moved to strike the Authority's Amended Decision, or in the alternative, asked for leave to file a second amended notice of appeal to respond to any changes and to include their *ultra vires* arguments concerning the Amended Decision. On September 6, 2023, this Court entered an order denying St. Joseph's motion to strike the Amended Decision, and granted leave for Petitioner to file a second amended notice of appeal. In denying Petitioner's motion to strike, this Court granted the leave required by WVRCP 60(a) to amend its original order. Therefore, we will not set aside the Authority's Amended Decision as *ultra vires*.[11]

## IV.  CONCLUSION

For the foregoing reasons, the West Virginia Health Care Authority's July 12, 2023, Amended Decision on Request for Ruling on Reviewability concluding that the proposed relocation of Stonewall's facility is not subject to CON review, is affirmed.

Affirmed.

---

[11] To be sure, it is preferable appellate practice to seek leave from an appellate court *prior to* amending a decision or order. However, in this case the result would have been the same, as both the original and amended decisions reach the same outcome based upon the same reasoning, so our *Chevron* analysis regarding the need for a CON would be unchanged.

22